USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT ____________________ No. 92-1279 UNITED STATES, Appellee, v. EFRAIN DE LA CRUZ, Defendant, Appellant. ____________________ No. 92-1347 UNITED STATES, Appellee, v. LUIS TORRES, Defendant, Appellant. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Douglas P. Woodlock, U.S. District Judge] ___________________ ____________________ Before Breyer, Chief Judge, ___________ Cyr and Boudin, Circuit Judges. ______________ ____________________ James E. Carroll with whom Peabody & Arnold was on brief for _________________ _________________ appellant Efrain De La Cruz. William H. Kettlewell with whom Dwyer, Collora & Gertner was on ______________________ __________________________ brief for appellant Luis Torres. Geoffrey E. Hobart, Assistant United States Attorney, with whom ___________________ A. John Pappalardo, United States Attorney, and Jeffrey A. Locke, _ ________________ _________________ Assistant United States Attorney, were on brief for appellee. ____________________ June 24, 1993 ____________________ BOUDIN, Circuit Judge. Efrain De La Cruz, Luis Torres _____________ and others were charged in a one-count indictment with conspiracy to possess cocaine with intent to distribute. 18 U.S.C. 841, 846. Torres pleaded guilty; De La Cruz was convicted following a jury trial. In this appeal, De La Cruz challenges his conviction on a number of grounds, and both he and Torres contest the district court's calculation of their sentences. We affirm. The events in this case are part of a larger story revolving around a so-called sting operation conducted by the FBI and other law enforcement agencies. In the course of this operation, Colombian drug dealers delivered 615 kilograms of cocaine to a man named Pedro Alvarez who was secretly cooperating with the authorities. The cocaine was transported into the United States and the FBI lodged it in Massachusetts while awaiting directions from the Colombian drug dealers. In describing the ensuing events, we confine the story to facts pertinent to this case. The cocaine arrived in the United States on or about June 4, 1991, and on June 5, the Colombian suppliers directed that a portion--240 kilograms--be turned over to the "Lucho" group. Alvarez made contact with a man purporting to be Lucho and it was agreed that Lucho's associates would take delivery at 5 p.m. on June 12, in the parking lot of a Holiday Inn in Taunton, Massachusetts. Two undercover -3- -3- officers--FBI Agent Dillon and Providence Police Officer Colon--appeared at the arranged time and place and saw a gold Cadillac with three occupants driving slowly through the parking lot. De La Cruz was the driver of the Cadillac and Torres was a passenger; the other passenger was Jose LaPaix. The agents flashed their lights and Torres left the car, approached the agents, and discussed the mechanics of the drug transfer. Torres said that he had brought three vans with him from New York equipped with hidden compartments but had left them in Newton, Massachusetts. It was agreed that Torres would drive to Newton with his companions to collect the vans and would contact Dillon and Colon when he returned to the Holiday Inn. Torres, De La Cruz and LaPaix departed in the Cadillac. Several hours later, around 9 p.m., Agent Dillon received a telephone message that Torres was waiting at the Holiday Inn. The agents returned to the parking lot. Torres approached their car and told them that he had the vans; but he said that having seen a police car driving through the lot, he had directed his "rollos"--a term used in the drug trade to refer to an underling such as a bodyguard or driver- -to move the vans out of the lot. Torres and the agents then agreed to meet at the rear of the lot. A few minutes later, Torres arrived there driving a blue van bearing New York plates with one Ruben Rodriguez seated -4- -4- next to him. A minute later De La Cruz pulled alongside the agents' car driving a red van with New York plates. The red van was followed by the gold Cadillac, now driven by LaPaix, with one Sarah Tavares as a passenger. The third van did not appear and a few minutes later Torres signaled the agents to lead the way to where the cocaine was stored. The FBI had located the shipment in a warehouse in Middleboro, Massachusetts, equipping the facility with video and audio recording equipment. Within half an hour, the caravan of vehicles arrived at the warehouse and parked in front. Agent Dillon, seeking to prevent too many of the suspected gang members from concentrating in one place, asked Torres to move one of his vehicles away to avoid attracting attention. Torres and LaPaix conferred; they then spoke with De La Cruz, who left the red van and drove the Cadillac across the street into a parking lot shared by a gas station and an ice cream parlor. De La Cruz drove slowly through this lot, which was partly lit and in view of a number of people. He then drove back across the street to an unlit vacant lot where he parked. This new lot was adjacent to the warehouse. De La Cruz left the Cadillac and started back toward the warehouse. He was then arrested by FBI agents. When arrested, he was carrying both a beeper and a portable telephone. -5- -5- Meanwhile, after De La Cruz left the warehouse parking lot in the Cadillac, Torres backed the blue van into the bay area of the warehouse, where he was joined by Rodriguez and LaPaix. The three men removed the rear seats and floor panel of the van, uncovering a hidden compartment. They then began loading the cocaine into the van. After about 70 kilograms were loaded into the compartment, the three men were arrested. Torres, when arrested, had in his pocket a business card with the telephone number used to reach De La Cruz's beeper. Subsequently, all five of those present at the warehouse--Torres, De La Cruz, Rodriguez, LaPaix and Tavares- -were indicted for conspiring to possess cocaine with intent to distribute. In early November 1991, some weeks before trial, LaPaix entered into plea negotiations and, on November 7, he made a limited proffer to the government for purposes of persuading it to treat him at sentencing as a minor participant. He made clear that he would refuse to testify for the government at trial and that he wanted his meeting with the government to remain confidential. During the proffer, LaPaix was asked how De La Cruz became involved. He responded that they were long-time friends and that prior to June 12 neither of them knew about the cocaine pick-up nor was De La Cruz promised payment for his help. Shortly after November 7, LaPaix' counsel told the -6- -6- other defense counsel--in what detail is not clear--about the meeting with the government and its subject matter. Prior to trial De La Cruz advised LaPaix' counsel that he intended to call LaPaix as a witness. Trial began on November 18, 1991. Immediately before the jury was impaneled, Torres and LaPaix pled guilty. The government dismissed the indictment as to Tavares. De La Cruz and Rodriguez then went to trial. On November 22, a Friday, the government rested and Rodriguez began to testify in his own defense. Rodriguez did not return to court the following Monday. The court refused De La Cruz's request to sever or for a mistrial and the case proceeded against De La Cruz and the now absent Rodriguez. On November 25, the sixth day of trial, De La Cruz moved for production of any exculpatory material created by LaPaix' proffer. In an ex parte submission, the government provided ________ to the court a summary of LaPaix' proffer. Over the government's objection, the court found the material to be subject to production under Brady v. Maryland, 373 U.S. 83 _____ ________ (1963). The government then disclosed to De La Cruz the contents of LaPaix' proffer, so far as it concerned De La Cruz, as follows: [During the drive from New York to Boston] LaPaix contacted Efrain De La Cruz. And De La Cruz drove LaPaix and Torres to the Holiday Inn in Taunton for the meeting with Special Agent Dillon . . . . As to why there were so many telephone calls between De La Cruz and LaPaix prior to the pickup of the -7- -7- cocaine or prior to the drive to Taunton, he indicated that they were long-time friends from the Dominican Republic . . . . The import of the statement was that De La Cruz did not know prior to June 12 about the cocaine pickup in the same way that LaPaix did not know prior to June 12th. De La Cruz then called LaPaix as a witness, advising the court that the proffer bore out De La Cruz' defense that he was unaware of the drugs and was merely helping out a childhood friend (LaPaix) find his way around Massachusetts. LaPaix was summoned but, in a voir dire examination, LaPaix ____ ____ invoked the Fifth Amendment and refused to answer all questions other than his name and address. De La Cruz objected to the claim of privilege in light of LaPaix' prior guilty plea. The district court nevertheless sustained the claim of privilege, observing that government cross- examination could produce testimony that would inculpate LaPaix not merely in the instant transaction but in other transactions. On November 26, the jury found De La Cruz and Rodriguez guilty. De La Cruz was sentenced to 188 months imprisonment and Torres to 235 months. These appeals followed. In this court, De La Cruz attacks his conviction by challenging the sufficiency of the evidence, the denial of his motion to sever or for a mistrial after Rodriguez disappeared, and the treatment of the proffer and LaPaix' claim of privilege. We address these issues first and then consider the claims of both De La Cruz and Torres concerning their sentences. -8- -8- We start with De La Cruz' attack on the adequacy of the evidence and find that the evidence as to his knowledge of the conspiracy was circumstantial, arguably thin, but clearly sufficient. The evidence, considered in the light most favorable to the government, see United States v. Ortiz, 966 ___ _____________ _____ F.2d 707, 711 (1st Cir. 1992), cert. denied, 113 S. Ct. 1005 _____________ (1993), shows that De La Cruz appeared at both meetings accompanying three other men involved in the drug deal (Torres, LaPaix and Rodriguez); that De La Cruz drove to Taunton one of the vans intended to carry the drugs; that he took instructions from Torres, the leader of the group; that he cruised slowly through the lot opposite the warehouse and then moved the Cadillac from a well-lit location to another location where it would be less likely to be noticed; that he carried a cellular telephone and a beeper--both well known tools of the drug trade; that the contact number for the beeper was in Torres' possession; and that De La Cruz and LaPaix had exchanged various telephone calls in the days prior to June 12. These facts, in our view, permitted a rational jury to conclude beyond a reasonable doubt that De La Cruz was a knowing participant in the conspiracy to transport drugs. Any one fact alone may be explained away; but the combination--presence at the scene, suspicious conduct, subordination to the gang leader on the scene, and possession -9- -9- of communication tools widely used in drug dealing--add up to more than the sum of the parts. It was left largely to his counsel to suggest, based on fragments of evidence, that De La Cruz was essentially a bystander, innocently doing a favor for his old friend LaPaix. It is not surprising that the jury rejected this tale. De La Cruz argues that his name never appeared in the hundreds of tape recordings made by the FBI as Alvarez promoted the sting with the Colombians, but there is no reason why a low level "rollo" should be mentioned in such conversations. True, De La Cruz never saw or touched the cocaine, nor is there direct evidence that he knew of its ______ existence. But knowledge may be based on circumstantial evidence, Ortiz, 966 F.2d at 711, and it is the jury's job to _____ draw the proper inference. Here the materials for drawing the inference were supplied to the jury, and the inference was rational. De La Cruz' next claim is that the government wrongly withheld information about LaPaix' proffer that it was obligated to disclose under the Brady doctrine. The _____ government has properly abandoned any claim that the proffer was not exculpatory at all. It now argues that the promise of confidentiality to LaPaix excused the government from disclosing the material, cf. United States v. Hicks, 848 F.2d __ _____________ _____ 1 (1st Cir. 1988), and that in any case LaPaix' lawyer -10- -10- disclosed the substance of the proffer to De La Cruz well before trial. We need not resolve the legal dispute on the first point or the factual dispute on the second, for the simple reason that the government did disclose the proffer, under compulsion, during trial.1 In cases of belated disclosure, "the critical inquiry is . . . whether the tardiness prevented defense counsel from employing the material to good effect." United States v. ______________ Devin, 918 F.2d 280, 290 (1st Cir. 1990). Here LaPaix' _____ proffer, assuming its contents were previously unknown to counsel for De La Cruz, did not reveal any new line of defense; rather, the proffer was consistent with the defense that De La Cruz had pursued from the outset. No evidence was lost by the delay: LaPaix was produced immediately. That he then claimed privilege is a problem De La Cruz would have faced whenever the proffer was disclosed. In short, we find no prejudice from the delay. We turn now to De La Cruz' claim that the district court erred in sustaining LaPaix' invocation of the Fifth Amendment. This claim is probably the most troublesome aspect of De La Cruz' appeal because it sets in tension two ____________________ 1We do not formally resolve the government's claim that it can avoid Brady by promising confidential treatment to _____ someone it interviews; but we are skeptical of any such blanket claim and would expect the government affirmatively to present the issue to the district court if otherwise exculpatory material were withheld on this ground. -11- -11- cardinal precepts: that a criminal defendant should have full opportunity to secure evidence in his own defense, and that a witness should be protected against being compelled to provide testimony that may incriminate him. The core of De La Cruz' argument is that LaPaix had already pled guilty to the conspiracy at issue and could not incriminate himself further if asked, as De La Cruz proposed to do, whether De La Cruz was aware that drugs were to be transported. It is uncertain what LaPaix would have said had he testified (the proffer was that De La Cruz knew nothing prior _____ to June 12) but the proffer was suggestive and it is surely possible that LaPaix would have exculpated his friend entirely. The jury in turn might have disbelieved any such exculpation in light of the friendship between the men and the other evidence against De La Cruz. But the hoped-for testimony was relevant and credibility is for the jury to decide. Since the government's evidence of De La Cruz' knowledge was circumstantial, the direct testimony of LaPaix to the contrary might have been important, even decisive. Yet whatever the cost to De La Cruz, under the Constitution LaPaix was entitled to invoke his Fifth Amendment privilege if testifying might incriminate him. The trial court's on-the-spot judgment as to the risk of self- incrimination is entitled to deference and "should not be overruled unless it is 'perfectly clear` . . . that the -12- -12- answers [sought from the witness] 'cannot possibly` incriminate." United States v. Johnson, 488 F.2d 1206, 1209 _____________ _______ (1st Cir. 1973) (quoting Hoffman v. United States, 341 U.S. _______ ______________ 479, 487-88 (1951)). In this case, we think the district judge was not only reasonable but plainly correct in holding that compelling LaPaix to testify could threaten to incriminate him. LaPaix had not been sentenced at the time of De La Cruz' trial, and "the convicted but unsentenced defendant retains a legitimate protectable Fifth Amendment interest" as to matters that could affect his sentence. United States v. _____________ Lugg, 892 F.2d 101, 102-03 (D.C. Cir. 1989); accord, United ____ ______ ______ States v. Lema, 987 F.2d 48, 54 n.6 (1st Cir. 1993). Here, ______ ____ if LaPaix testified that he had recruited De La Cruz and involved him in the plot without telling him of the drugs, this testimony could have hurt LaPaix' chances at sentencing of being treated as a minor or minimal participant, U.S.S.G. 3B1.2, and could even have led the court to classify him as a "supervisor," and enhance his sentence. U.S.S.G. 3B1.1 & comment note 1 (listing "the recruitment of accomplices" as relevant to evaluating a defendant's role in the offense). As the district court suggested, testifying would also have put LaPaix at risk of disclosing his involvement in other drug transactions. The government, in order to challenge LaPaix' testimony exculpating De La Cruz, would -13- -13- almost certainly have sought to question LaPaix vigorously about other possible transactions in which LaPaix and De La Cruz were involved. The aim would be to undercut LaPaix' claim of an innocent friendship that led by accident to De La Cruz' presence at the scene. See Fed. R. Evid. 404(b) (other ___ wrongs may be proved to refute claim of mistake or accident). And LaPaix' refusals on voir dire to provide anything except ____ ____ his name and address indicate that the privilege would have been promptly invoked in response to such questions. Some courts have said that the trial judge may or even must limit the government's cross-examination on collateral matters if this can be done without unduly limiting the government and if doing so will preserve the defendant's ability to call a material witness who would otherwise claim the privilege.2 In this case, however, effective government cross-examination would have been seriously impaired if the prosecutor were denied latitude to explore the joint criminal history of De La Cruz and LaPaix. Faced with a simple denial by LaPaix that he had told De La Cruz of the cocaine--the testimony that De La Cruz' counsel said he hoped to elicit-- ____________________ 2See United States v. Esparsen, 930 F.2d 1461, 1469-70 ___ ______________ ________ (10th Cir.), cert. denied, 112 S. Ct. 882 (1991) (collecting ____________ cases). United States v. Pardo, 636 F.2d 535 (D.C. Cir. ______________ _____ 1980), is the classic example. In United States v. Zirpolo, _____________ _______ 704 F.2d 23, 26 (1st Cir.), cert. denied, 464 U.S. 822 _____________ (1983), this court declined to decide whether it would follow Pardo. _____ -14- -14- inquiry into the past activities of the two would have been the most obvious resort for cross-examination. We have "recognized the need to prevent coconspirators from `whitewashing' each other through use of testimony unchallengeable for one reason or another." Zirpolo, 704 _______ F.2d at 26 (quoting United States v. Lowell, 649 F.2d 950, ______________ ______ 962 (3d Cir. 1981)). There is nothing that prevents a defendant from offering such testimony if the alleged co- conspirator is willing to testify, but the safeguard of cross-examination is more important than usual in such a case. Cf. Fed. R. Evid. 804(b)(3) (excluding hearsay ___ evidence of this kind, unless corroborated, from declaration- against-interest exception to the hearsay rule). In short, we do not think that in this case the privilege could properly be preserved by cabining the government's cross- examination. Of course, the prosecutor could resolve the dilemma by seeking formal immunity for the witness under 18 U.S.C. 6003, but most courts have held that judges are powerless to compel such a grant by the U.S. Attorney. See United States ___ _____________ v. Angiulo, 897 F.2d 1169, 1191 (1st Cir.) (collecting _______ cases), cert. denied, 498 U.S. 845 (1990). Indeed, the _____________ privilege has been routinely invoked by alleged co- conspirators called by the defendant to exculpate him. E.g., ____ Zirpolo, 704 F.2d at 25; Johnson, 448 F.2d at 109. A trial _______ _______ -15- -15- court might still refuse to entertain the prosecution if it found that defense testimony had been thwarted by the misconduct of the prosecutor (e.g., by gratuitously _____ threatening to prosecute the witness if he testifies). No basis has been suggested for a misconduct claim in this case. It must be remembered that the defendant could also testify to the very same exculpatory facts, for "[a] defendant is available to himself as a witness." Gacy v. ____ Welborn, Nos. 92-3448 and 92-3965, slip op. at 22 (7th Cir. _______ April 12, 1993). A defendant who declines to testify, protecting himself against self-incrimination on cross- examination, is well within his rights; but so is the witness who invokes his own Fifth Amendment rights to avoid testifying and so is the prosecutor who declines to grant immunity to the witness. There may be rare cases where the denial of immunity would comprise a miscarriage of justice. This is not such a case. De La Cruz' final argument, apart from sentencing issues, is that the court erred in denying his motion for a mistrial or a severance when Rodriguez failed to appear for the sixth day of trial. While the jury might have inferred Rodriguez' guilt from his flight, the jury was shown a videotape of Rodriguez loading cocaine into the van so the inference added little. De La Cruz had no direct link with Rodriguez and there is no reason why he should have been -16- -16- affected by the inference. Finally, the court offered to negate the inference with an appropriate instruction, but De ______ La Cruz' counsel objected to such an instruction, preferring to argue to the jury about the import of Rodriguez' absence. Nor can any prejudice be traced to Rodriguez' own testimony, completed but not fully cross-examined, when he left the trial. We have reviewed Rodriguez' testimony and conclude that it did not incriminate De La Cruz or seriously conflict with his own theory of defense. Indeed, Rodriguez never once referred to De La Cruz. In any case, the court offered to strike the testimony and so instruct the jury but again, for tactical reasons, De La Cruz rejected this offer, so we do not see how he can now complain that the testimony remained on the record. We come, finally, to the objections of De La Cruz and Torres to the sentences imposed upon them. A narcotics conspirator is responsible not only for drugs he actually handled or saw but also for the full quantity of drugs that he reasonably could have foreseen to be embraced by the conspiracy he joined. See U.S.S.G. 2D1.4, 2D1.1, 1B1.3 & ___ comment n.1; United States v. O'Campo, 973 F.2d 1015, 1023 _____________ _______ (1st Cir. 1992). The district court's finding as to the quantity embraced by the conspiracy and reasonably foreseen by the defendant is a factual one and will not be disturbed unless clearly erroneous. United States v. Tracy, 989 F.2d ______________ _____ -17- -17- 1279, 1287 (1st Cir.), cert. denied, 61 U.S.L.W. 3773 (1993). ____________ The same standard of review applies to other factual issues pertinent to sentencing, including the role played by the defendant in the conspiracy. United States v. Tabares, 951 _____________ _______ F.2d 405, 410 (1st Cir. 1991). Here, the district court held De La Cruz responsible for the entire 240 kilograms of cocaine that the Lucho group sought to collect from the warehouse. De La Cruz argues in this court that there is no evidence that he knew the precise amount of cocaine that was inside the warehouse. Strictly speaking, that is so. What he must have known, however, was that a very large quantity was involved: as the district court noted, De La Cruz was part of a four vehicle caravan that included two vans destined to carry away the cocaine stored at the warehouse. A defendant who conspires to transport for distribution a large quantity of drugs, but happens not to know the precise amount, pretty much takes his chances that the amount actually involved will be quite large. On De La Cruz' theory, no amount at all could properly be assigned to him if, as may well be the case, he never had a specific quantity in mind. The danger actually posed by the conspiracy was the distribution of 240 kilograms, De La Cruz knew that a large quantity was involved, and--absent special circumstances--we think that is enough. -18- -18- De La Cruz also takes issue with the district court's decision to treat him as a "minor participant" in the conspiracy, resulting in a two-level downward adjustment. U.S.S.G. 3B1.2(b). Instead, De La Cruz argues, he should have been classed as a "minimal participant" and given a four-level reduction under section 3B1.2(a). The guidelines and commentary do not define "minimal" but they do say that the adjustment will be used "infrequently"; and they also furnish a pair of examples of a minimal participant: "someone who played no other role in a very large smuggling operation than to offload part of a single marihuana shipment, or . . . an individual [who] was recruited as a courier for a single smuggling transaction involving a small amount of drugs." U.S.S.G. 3B1.2 comment note 2. Here, De La Cruz was one of the drivers in a caravan seeking to carry away a very large cache of narcotics. He fits neither the letter nor the spirit of the examples. Torres, by contrast, was found to be an "organizer, leader, manager or supervisor" and accorded a two-level increase in his offense level. U.S.S.G. 3B1.1(c). This enhancement is appropriate if the defendant "exercised some degree of control over others involved in the commission of the crime . . . ." United States v. Fuller, 897 F.2d 1217, _____________ ______ 1220 (1st Cir. 1990). Here, the facts already recited amply support the district court's finding that Torres' role was -19- -19- equivalent to that of a job-site foreman: he took charge of the negotiations with the undercover agents to fix the final time for the drug transfer, orchestrated the arrival of the vans, and directed the actions of De La Cruz and Rodriguez. Contrary to Torres' argument in this court, the fact that Torres may have been working for Lucho does not prevent Torres from being treated as a supervisor. "A defendant need not be the highest ranking member of a criminal troupe in order to be a manager or supervisor." United States v. ______________ Savoie, 985 F.2d 612, 616 (1st Cir. 1993). United States v. ______ _____________ Sostra, 967 F.2d 728 (1st Cir. 1992), relied upon by Torres, ______ is not on point. There, the defendant's role in the drug transactions was that of "steerer," bringing together potential buyers and sellers. Id. at 733. There was __ "nothing in the record to show that he [Sostra] exerted control over any of the other codefendants, with the possible exception of his brother . . . ." Id. __ In sum, we conclude that De La Cruz' conviction and sentence and Torres' sentence were proper and must be affirmed. ________ -20- -20-