USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 95-1113 UNITED STATES, Appellee, v. RAYMOND J. GARY, Defendant - Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND [Hon. Mary M. Lisi, U.S. District Judge] ___________________ ____________________ Before Selya and Boudin, Circuit Judges, ______________ and Saris,* District Judge. ______________ _____________________ Marie T. Roebuck for appellant. ________________ Sheldon Whitehouse, United States Attorney, with whom ___________________ Gerard B. Sullivan and Margaret E. Curran, Assistant United ___________________ ___________________ States Attorneys, were on brief for appellee. ____________________ January 5, 1996 ____________________  ____________________ * Of the District of Massachusetts, sitting by designation. SARIS, District Judge. After his first jury trial SARIS, District Judge. ______________ ended in deadlock, defendant Raymond J. Gary ("Gary") was convicted by a second jury of possession of a firearm by a felon, in violation of 18 U.S.C. 922(g). He was sentenced to over twenty-four years incarceration as an armed career criminal pursuant to 18 U.S.C. 924(e). Gary raises six issues on appeal: (1) whether the district court violated his Sixth Amendment right to compulsory process by precluding him from calling a defense witness who would provide exculpatory information on direct examination but would assert the Fifth Amendment with respect to non-collateral issues on cross-examination; (2) whether the district court erred in finding that this defense witness had not waived his Fifth Amendment privilege against self-incrimination by virtue of his testimony at the first trial; (3) whether the government properly sought authorization to prosecute under the U.S. Justice Department guidelines regarding dual federal-state prosecutions (i.e., the "Petite policy"); (4) whether Gary was selectively prosecuted on account of his race; (5) whether Gary received a fair trial in light of the government's reliance on what he contends was "perjured testimony by a law enforcement official"; and (6) whether the district court misapplied U.S.S.G. 4B1.4 in -2- determining Gary's total offense level.1 We affirm the conviction and sentence. I. STATEMENT OF THE CASE I. STATEMENT OF THE CASE _____________________ A. FACTS A. FACTS We set forth the evidence in the light most favorable to the verdict. United States v. Tuesta-Toro, 29 F.3d 771, 773 _____________ ___________ (1st Cir. 1994), cert. denied, __ U.S. __, 115 S. Ct. 947 (1995). ____________ On May 14, 1994, Gary and a friend, Eric Hopkins, spent part of the evening going to nightclubs. After midnight, Patrolman James Joseph Corry of the North Providence Police Department encountered Gary and Hopkins when they were attempting to break into Rhode Island Auto Radio. Earlier that evening, they had stolen some vases from a furniture store elsewhere in North Providence. Upon seeing Corry, Hopkins fled on foot and Gary attempted to escape by car at high speed. Gary lost control of the vehicle, which left the road and struck the foundation of an adjacent building. Corry caught up to Gary as he was attempting to exit the wrecked automobile. Gary resisted arrest, and the efforts of several officers were necessary to subdue him. Once the officers successfully apprehended Gary, they conducted a "pat-down" search for weapons. At that time, a loaded and fully- operable Colt .25 caliber handgun fell from Gary's waistband. Hopkins also was arrested, and a Dickson .25 caliber semi-  ____________________ 1 Gary also contends he did not receive a fair trial in light of the totality and cumulative effect of the trial court's errors. Since we do not find error with respect to any of the issues, we do not address this claim separately. -3- automatic pistol was seized from him. Hopkins later admitted to possessing the firearm. -4- B. PROCEEDINGS BELOW B. PROCEEDINGS BELOW Gary and Hopkins each were initially charged in state court with violations of the Rhode Island General Laws.2 On June 9, 1994, a federal grand jury returned an indictment charging both with possession of a firearm by a felon in violation of 18 U.S.C. 922(g). On August 31, 1994, the government filed a notice that, if Gary was convicted, it would seek a penalty enhancement pursuant to the Armed Career Criminal Act ("ACCA"), 18 U.S.C. 924(e)(1). Hopkins pled guilty, on September 8, 1994. From October 13 to 17, 1994, Gary was tried by a jury before Judge Raymond J. Pettine. Hopkins, who was represented by counsel, testified on Gary's behalf and was cross-examined by the government concerning the break-ins, the circumstances of the arrest, and the firearms. The proceedings ended in a mistrial when the jury announced that it was unable to reach a verdict. Gary's case then was transferred to Judge Mary M. Lisi, before whom the second jury trial commenced on October 25, 1994. When Gary attempted to call Hopkins to the stand, however, the government objected on the grounds that Hopkins would invoke his Fifth Amendment right against self-incrimination during cross- examination. At a conference and subsequent voir dire outside the presence of the jury, Gary proffered that Hopkins would testify that, while they were together at nightclubs on the night  ____________________ 2 Gary was charged with possession of a firearm, breaking and entering, conspiracy, assault with a dangerous weapon, and reckless driving.  -5- of May 14, 1994, he never saw Gary possess a firearm and that they were together until approximately ten minutes preceding the automobile wreck after which Gary was arrested. In the voir dire, Hopkins asserted his privilege against self-incrimination in response to questioning about the breaking and entering, which immediately preceded his arrest. Hopkins was then facing pending state breaking and entering charges and a parole revocation proceeding and had not yet been sentenced on the federal charge. Although Hopkins had testified in the first trial regarding the breaking and entering and had been assisted by counsel at that time, the court held that his prior testimony was not a voluntary, knowing, and intelligent waiver of his Fifth Amendment privilege, particularly because Hopkins' separate counsel for the state proceedings had not been informed that Hopkins would be appearing in federal court.3 Moreover, the court held that the government's intended cross-examination regarding the breaking and entering was "germane" and "permissible" and thus refused to restrict its scope. After excusing Hopkins from testifying, the court permitted Gary to introduce Hopkins' prior recorded testimony from the first trial by having it read to the jury by Hopkins' state counsel. Notwithstanding this ruling, Gary argued that his  ____________________ 3 Hopkins was represented by three different attorneys in the various federal and state proceedings who apparently did not communicate in advance of Hopkins' testimony in the first trial. In addition, when Gary's counsel interviewed Hopkins to solicit information upon which his testimony in the first trial was based, she asked permission only of the attorney representing Hopkins on the federal charges.  -6- Sixth Amendment right to compulsory process was violated and moved for a mistrial on that ground. This motion was denied. The jury returned a verdict of guilty on October 28, 1995. Gary was sentenced as an armed career criminal to twenty- four years and two months imprisonment, five years of supervised release, and a $50 special assessment. Judgment was entered on January 19, 1995, and Gary filed a timely notice of appeal.  II. ANALYSIS II. ANALYSIS ________ A. Sixth Amendment Compulsory Process A. Sixth Amendment Compulsory Process This case requires us to harmonize a conflict between a defendant's Sixth Amendment right "to have compulsory process for obtaining witnesses in his favor," U.S. Const. amend. VI, and the government's interest in cross-examining a defense witness who has invoked his Fifth Amendment right against self-incrimination. Gary contends that his right to compulsory process was denied when the trial court refused to permit Hopkins to testify and instead only permitted Hopkins' testimony from the first trial to be read to the jury. Gary argues that the trial court should have required Hopkins to invoke his right against self- incrimination during cross-examination in the jury's presence.  "The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense . . . . This right is a fundamental element of due process of law." Washington v. Texas, 388 U.S. __________ _____ 14, 19 (1967); see also Chambers v. Mississippi, 410 U.S. 284, ________ ________ ___________ -7- 302 (1973). The Sixth Amendment, however, does not provide "an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." Taylor v. Illinois, 484 U.S. 400, 410 (1988). As the ______ ________ Supreme Court noted in an opinion upholding a trial judge's decision to preclude a defense witness's testimony on evidentiary grounds, "[t]he Sixth Amendment does not confer the right to present testimony free from the legitimate demands of the adversary system; one cannot invoke the Sixth Amendment as a justification for presenting what might have been a half-truth." United States v. Nobles, 422 U.S. 225, 241 (1975). _____________ ______ While the government's interest in cross-examining defense witnesses is not rooted in the Constitution, see United ___ ______ States v. Pardo, 636 F.2d 535, 542 n.21 (D.C. Cir. 1980) ("The ______ _____ government of course has no Sixth Amendment or other constitutional right to cross-examine defense witnesses."), one of the legitimate demands of the adversary system is the right of cross-examination. See Fed. R. Evid. 611(b) (permitting cross- ___ examination "limited to subject matter of the direct examination and matters affecting the credibility of witness"). "Cross- examination is the principal means by which the believability of a witness and the truth of his testimony are tested." Davis v. _____ Alaska, 415 U.S. 308, 316 (1974). As Professor Wigmore stated: ______ The main and essential purpose of confrontation is to secure for the ______________________ opponent the opportunity of cross- _________________________________________ examination. The opponent demands ___________ confrontation, not for the idle purpose of gazing upon the witness, or of being -8- gazed upon by him, but for the purpose of cross-examination, which cannot be had except by the direct and personal putting of questions and obtaining immediate answers. 5 J. Wigmore, Evidence 1395, at 150 (Chadbourne rev. 1974) ________ (emphasis in original), quoted in Davis, 415 U.S. at 315-16; see _________ _____ ___ also United States v. Stubbert, 655 F.2d 453, 457 (1st Cir. 1981) ____ _____________ ________ (quoting same). Courts have not permitted defendants to call witnesses to the stand who have indicated that they will refuse to answer the government's questions on cross-examination with respect to non-collateral matters. In United States v. De La Cruz, 996 F.2d _____________ __________ 1307 (1st Cir.), cert. denied, __ U.S. __, 114 S. Ct. 356 (1993), ____________ the defendant called his friend and former co-defendant as a witness, but in a voir dire examination, he refused to answer any questions other than his name and address on self-incrimination grounds. In response to the suggestion that the government's cross-examination should be limited so that the defense witness's privilege need not be invoked, we held that "effective cross- examination would have been seriously impaired if the prosecutor were denied latitude to explore the joint criminal history" and affirmed the trial judge's decision not to permit the witness to testify. Id. at 1312-14. See also United States v. Parcels of ___ _________ _____________ __________ Land, 903 F.2d 36, 43 (1st Cir. 1990) ("It is well-accepted that ____ a witness's direct testimony can be stricken if she invokes the fifth amendment on cross-examination to shield that testimony from scrutiny.") (citing cases); United States v. Zirpolo, 704 _____________ _______ -9- F.2d 23, 25-26 (1st Cir.) (when defense witness rightfully refuses to answer questions based on the privilege against self- incrimination, trial court need not limit scope of government's cross-examination on conversations relating to other contemporaneous drug offenses), cert. denied, 464 U.S. 822 _____________ (1983); accord Denham v. Deeds, 954 F.2d 1501, 1503-04 (9th Cir. ______ ______ _____ 1992) ("We . . . join with those circuits that have permitted the exclusion of a defense witness's testimony when the witness has refused on cross-examination to respond to questions on non- collateral matters."); United States v. Esparsen, 930 F.2d 1461, _____________ ________ 1469-70 (10th Cir. 1991) (same), cert. denied, 502 U.S. 1036 ____________ (1992); United States v. Doddington, 822 F.2d 818, 822 (8th Cir. _____________ __________ 1987) (trial court properly struck direct testimony of defense witness who invoked Fifth Amendment during cross-examination). Attempting to combat this solid phalanx of precedent, Gary cites cases in which courts permitted government witnesses to invoke the privilege against self-incrimination during defendant's cross-examination without violating the Confrontation Clause of the Sixth Amendment. See United States v. Berr o- ___ _____________ _______ Londo o, 946 F.2d 158, 160-61 (1st Cir. 1991), cert. denied, 502 _______ ____________ U.S. 1114 (1992); Stubbert, 655 F.2d at 457-58. Each of these ________ cases rely on the Second Circuit's much-cited holding in United ______ States v. Cardillo, 316 F.2d 606, 611 (2d Cir.), cert. denied, ______ ________ ____________ 375 U.S. 822 (1963) that: In determining whether the testimony of a witness who invokes the privilege against self-incrimination during cross- examination may be used against the -10- defendant, a distinction must be drawn between cases in which the assertion of the privilege merely precludes inquiry into collateral matters which bear only on the credibility of the witness and those cases in which the assertion of the privilege prevents inquiry into matters about which the witness testified on direct examination. When cross-examination is precluded only with respect to collateral issues, the Sixth Amendment does not require the court to strike the witness's testimony. See Berr o-Londo o, 946 F.2d ___ ______________ at 161 (refusing to strike direct testimony when cross- examination limited to issues "not relevant to Berr o-Londo o's guilt or innocence"); Stubbert, 655 F.2d at 457-58. ________ When cross-examination on material issues raised on direct examination is curtailed because of a witness's valid claim of privilege, however, the trial court, in its discretion, may refuse to permit that witness's testimony. See De La Cruz, ___ __________ 996 F.2d at 1313-14. Just as the trial court must be vigilant in ensuring that a defendant has a full and fair cross-examination, see Cardillo, 316 F.2d at 611, it must similarly safeguard the ___ ________ government's cross-examination "to prevent coconspirators from 'whitewashing' each other through the use of testimony unchallengeable for one reason or another." Zirpolo, 704 F.2d at _______ 26 (quoting United States v. Lowell, 649 F.2d 950, 962 (3d Cir. _____________ ______ 1981)). We have recognized that it "may sometimes be feasible for a district court to reconcile the defendant's right to present witnesses with a witness's privilege against self- -11- incrimination by limiting the scope of the latter's testimony." Id. at 26. In striking the appropriate balance between a ___ defendant's Sixth Amendment rights and the government's interest in cross-examination, a "trial judge may or even must limit the government's cross-examination on collateral matters if this can be done without unduly limiting the government and if doing so will preserve the defendant's ability to call a material witness who would otherwise claim the privilege." De La Cruz, 996 F.2d ___________ at 1313; see also Pardo, 636 F.2d at 544 ("[W]here the rights of ________ _____ the defendant and the government can be reconciled, the defendant's constitutional right to procure testimony in his favor must prevail."). Where, as here, a defense witness's claim of privilege shields material testimony from cross-examination, however, this balance weighs against the defendant. The trial court held a voir dire hearing to determine whether the subject matter concerning which the witness intended to assert the Fifth Amendment was collateral. She fairly concluded that it was not. See Fed. R. Evid. 611(b) (giving court authority to exercise ___ reasonable control over examination of witnesses to "make the interrogation and presentation effective for the ascertainment of the truth"). In considering similar types of challenges brought under the Confrontation Clause of the Sixth Amendment, we have applied an abuse of discretion standard. See Berr o-Londo o, 946 ___ ______________ F.2d at 160 (holding that trial court did not abuse its -12- discretion by refusing to strike witness's testimony on direct examination when witness asserted Fifth Amendment on collateral matters on cross-examination, particularly when witness was required to invoke privilege in presence of jury). We apply the same abuse of discretion standard in determining kindred challenges under the Compulsory Process Clause of the Sixth Amendment. See United States v. Blum, 62 F.3d 63, 67 (2d Cir. ___ _____________ ____ 1995) (applying abuse of discretion standard to review evidentiary decision challenged on Compulsory Process Clause ground). We find no abuse of discretion here. According to Gary's proffer, "Hopkins would have testified that during the course of the evening, he was able to observe [Gary] and never visually saw a firearm on his person, nor was one detected by the metal detectors, or doorman at the nightclubs." Hopkins' testimony certainly was material to the defense as it showed that, after a significant period of observation, he did not see Gary possess a firearm. However, at the first trial, Hopkins testified that the pair had been involved in two instances of breaking and entering after leaving the clubs and that he did not know whether Gary had hidden a gun in his car before going to the clubs. Had Hopkins been permitted to testify and to refuse to answer questions regarding the breaking and entering, as he told the court he would, the government's cross-examination of Hopkins would have been rendered ineffective.  -13- Thus the trial court found, "[t]he matters that Mr. Hopkins would have testified to and, in fact, did testify to at the previous trial were closely related in time and space to the matter that is before the Court in which the jury must consider. And therefore, all of the information that would have been elicited or attempted to have been elicited by the Government would have been germane and would have been permissible." We discern no abuse of discretion in the trial court's determination that the subject matter of the cross-examination as to which Hopkins would have asserted his privilege was material and relevant. Any limitation on cross-examination would have been unduly prejudicial to the government. Furthermore, in striking the appropriate balance, the trial court took into consideration that Gary was not deprived of an opportunity to present Hopkins' testimony. Although Hopkins did not appear personally in the second trial, his testimony from the first trial was read in full to the jury. It was read with counsel for the government and for Gary each reading their respective parts and a third person reading Hopkins' responses. Indeed, at oral argument Gary's counsel engaged in a brief thespian demonstration intended to convey the desiccated manner in which Hopkins' testimony was read at Gary's second trial. We noted then, and reiterate today, that whenever transcript testimony is admitted in a trial, the fact-finder is deprived of a full-fledged opportunity to assess directly the credibility and demeanor of the declarant. The rules of evidence, however, -14- permit such evidence to be admitted at trial. See Fed. R. Evid. ___ 804(b)(1) (former testimony exception to hearsay rule). Gary suggests that, rather than prohibit Hopkins' live testimony altogether, the trial court should have permitted Hopkins to testify on direct examination and forced him to invoke the Fifth Amendment privilege on cross-examination in the presence of the jury. That solution, Gary argues, strikes a more appropriate balance between the government's and the defendant's interests because "the government could have used the transcript to impeach this testimony or could have relied upon the adverse inference of the witness's invocation of the Fifth." This approach finds some support in United States v. Kaplan, 832 F.2d _____________ ______ 676 (1st Cir. 1987), cert. denied, 485 U.S. 907 (1988), where we ____________ held that when "a non-party government witness invokes the Fifth Amendment on cross-examination at trial, the court should permit the assertion of the privilege in the presence of the jury. The invocation of the privilege acts as a form of impeachment." Id. ___ at 684.  In Kaplan, we distinguished United States v. Johnson, ______ ______________ _______ 488 F.2d 1206 (1st Cir. 1973), in which we held that a court did not abuse its discretion in refusing to allow a defense witness to take the stand when, after direct examination was completed, that witness would assert the Fifth Amendment as to "essentially all" questions on cross-examination. Id. at 1211. The basis for ___ the distinction follows: A different case is presented where, as here, the defense seeks to cross-examine -15- a government witness within the scope of his direct and then the witness asserts the privilege. We note, first, that the impact on the jury's deliberations from asserting the privilege has to be less here than in Johnson from the fact that _______ Brown did not claim the privilege comprehensively. Instead, Brown answered most questions put to him by the defense and could have refused to answer at trial only those bearing on the alleged cocaine abuse. And whatever danger exists that the jury may give too much weight to this line of questioning is small in comparison to its impeachment value. Kaplan, 832 F.2d at 684. ______ Unlike Kaplan, where the invocation of the Fifth ______ Amendment pertained to a collateral matter -- the effect of alleged cocaine abuse on the witness's power of memory or observation -- here the assertion of the privilege would have shielded the witness from testifying on a core issue addressed on direct examination. Hopkins' claim of privilege would have precluded government inquiry into the intervening events between the time Hopkins observed the defendant to have no firearm and the time the police officer testified he saw a gun in defendant's possession. Such testimony would have been directly relevant to Gary's guilt or innocence. Accordingly, while the trial judge may have had the discretion to strike a balance along the lines -16- proposed by the defendant,4 there was no abuse of discretion in striking the balance a different way.5 B. Waiver of Fifth Amendment Privilege B. Waiver of Fifth Amendment Privilege Against Self-Incrimination Against Self-Incrimination Gary asserts that Hopkins waived his privilege against self-incrimination by virtue of his testimony in the first trial regarding the breaking and entering. Therefore, he contends, the trial court wrongly sustained Hopkins' claim of privilege in the second trial. The Fifth Amendment privilege is "fundamental to our system of constitutional rule." Miranda v. Arizona, 384 U.S. _______ _______ 436, 469 (1966). However, "the privilege against self- incrimination presupposes a real danger of legal detriment arising from the disclosure." Rogers v. United States, 340 U.S. ______ _____________ 367, 372-73 (1951). Thus the privilege may be waived, see id. at ___ ___ 370-71, or obviated by a prosecutorial grant of immunity. See ___ Kastigar v. United States, 406 U.S. 441, 461-62 (1972); cf. ________ ______________ ___ United States v. Angiulo, 897 F.2d 1169, 1191 (1st Cir.) (court _____________ _______ ordinarily cannot grant immunity), cert. denied, 498 U.S. 845 _____________ (1990).   ____________________ 4 There is no evidence in the record that the defendant proposed this particular solution to the trial judge.  5 We also note that if Gary had opted to testify as to whether he possessed a gun at the time of his arrest, he would not have been permitted to take the Fifth Amendment with respect to the breaking and entering offenses which immediately preceded. See ___ Brown v. United States, 356 U.S. 148, 155-57 (1958) (holding that _____ _____________ defendant's exercise of right to testify in own behalf waives his Fifth Amendment privilege against self-incrimination). -17- Once a witness voluntarily has revealed an incriminating fact, "the privilege cannot be invoked to avoid disclosure of the details." Rogers, 340 U.S. at 373. However, ______ "[i]t is hornbook law that the waiver is limited to the particular proceeding in which the witness appears." United ______ States v. Cain, 544 F.2d 1113, 1117 (1st Cir. 1976) (co- ______ ____ defendant's submission to deposition in unrelated criminal proceeding not waiver of Fifth Amendment in proceeding in which co-defendant called as witness); see also Johnson, 488 F.2d at _________ _______ 1210-11 (witness's disclosures in entering guilty plea at Rule 11 hearing do not constitute waiver of privilege at co-defendant's trial); Kirane v. City of Lowell, 622 F. Supp. 262, 265 (D. Mass. ______ ______________ 1985) ("[A] person who waives his privilege as to the one trial [is not] estopped from asserting the privilege as to the same matter in a subsequent trial or proceeding."); 8 J. Wigmore, Evidence 2276, at 470-72 (McNaughton rev. 1961) ("The waiver ________ involved is limited to the particular proceeding in which the _____________________________________ witness volunteers the testimony or the accused takes the stand . . . . Nor is his testimony at a first trial a waiver for a later _____ trial.") (emphasis in original). Therefore, Gary's contention _____ that Hopkins waived his privilege in the second trial by testifying in the first trial is misplaced.6  ____________________ 6 The trial court arrived at the same conclusion by a different path, namely, that Hopkins' decision to testify at the first trial was not a voluntary, knowing, and intelligent waiver of his Fifth Amendment privilege because he had not been fully apprised of the consequences of his testimony with respect to the state proceedings. In light of the above discussion, we need not address the propriety of this decision. See In re Morganroth, ___ ________________ -18- C. The "Petite Policy" C. The "Petite Policy" Gary contends that his federal prosecution violated the Justice Department's policy guarding against dual federal-state prosecutions. See Petite v. United States, 361 U.S. 529 (1960) ___ ______ _____________ (per curiam) (vacating conviction at government's request because prosecution contravened internal Justice Department policy forbidding multiple prosecutions for same criminal conduct). "The Petite policy is an internal Justice Department policy forbidding federal prosecution of a person for alleged criminality which was 'an ingredient of a previous state prosecution against that person'; exceptions are made only if the prosecution will serve 'compelling interests of federal law enforcement.'" United States v. McCoy, 977 F.2d 706, 712 (1st _____________ _____ Cir. 1992) (quoting Thompson v. United States, 444 U.S. 248, 248 _________________________ (1980)) (citation omitted). See also Rinaldi v. United States, ________ _______ ______________ 434 U.S. 22, 24 n.5 (1977) (per curiam) (policy bars dual federal-state prosecution). We have repeatedly held that the Petite policy does not confer substantive rights on criminal defendants. See McCoy, 977 F.2d at 712; United States v. Booth, ___ _____ _____________ _____ 673 F.2d 27, 30 (1st Cir.), cert. denied, 456 U.S. 978 (1982).  ____________ D. Selective Prosecution D. Selective Prosecution Gary's contention that he was entitled to an evidentiary hearing on the ground of selective prosecution is similarly without merit. Although the exercise of prosecutorial  ____________________ 718 F.2d 161, 165 (6th Cir. 1983) (holding that waiver of privilege against self-incrimination is "proceeding specific").  -19- discretion is subject to the constitutional guarantee of equal protection and "may not be deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification," Wayte v. United States, 470 U.S. 598, 608 _____ ______________ (1985) (internal quotation marks and citations omitted), the prosecutor is entitled to "a threshold presumption that [he] acted 'in good faith for reasons of sound governmental policy.'" United States v. Pe agar cano-Soler, 911 F.2d 833, 837 (1st Cir. ______________ __________________ 1990) (quoting United States v. Saade, 652 F.2d 1126, 1135 (1st _____________ _____ Cir. 1981)). As an initial matter, we note that Gary did not timely raise this issue before the district court. In a brief colloquy on the morning of trial, Gary's counsel first raised the issue of selective prosecution to the trial judge but admitted that she had not filed a motion for an evidentiary hearing. In the absence of exceptional circumstances -- and none are presented here -- a claim of selective prosecution that is not raised prior to trial is deemed waived. Tracey v. United States, 739 F.2d ______ ______________ 679, 682 (1st Cir. 1984), cert. denied, 469 U.S. 1109 (1985). ____________ Even if the motion had been timely filed, the burden is upon the defendant to make an initial showing that an evidentiary hearing is warranted. "A selective prosecution claim merits evidentiary hearing if it alleges sufficient 'facts a) tending to show that [defendant] has been selectively prosecuted and b) raising a reasonable doubt about the propriety of the prosecution's purpose' . . . unless the government can present -20- countervailing reasons." Pe agar cano-Soler, 911 F.2d at 838 __________________ (quoting Saade, 652 F.2d at 1135). A trial judge's decision not _____ to hold an evidentiary hearing is reviewed for abuse of discretion. See id.  ___ ___ Here, Gary did not make any threshold showing to the trial court tending to show selective prosecution, i.e., "that [he] was prosecuted while others similarly situated were not." United States v. Bassford, 812 F.2d 16, 20 (1st Cir.), cert. ______________ ________ _____ denied, 481 U.S. 1022 (1987). Gary attempts to make the required ______ showing to this Court by appending "statistics" purporting to demonstrate evidence of systemic selective prosecution in the District of Rhode Island. Gary did not present this information to the trial court, and we will not consider on appeal evidentiary submissions that were not presented below. United ______ States v. Kobrosky, 711 F.2d 449, 457 (1st Cir. 1983).7 ______ ________ E. Reliance on Perjured Testimony E. Reliance on Perjured Testimony Gary contends that his conviction was somehow tainted by allegedly perjurious testimony that was elicited in his first _____ trial. Specifically, he contends that Officer John Arzoomanian  ____________________ 7 These so-called statistics, compiled by hand by defense counsel based on "information and belief," are comprised solely of a list of prosecutions brought in the District of Rhode Island under 18 U.S.C. 922 and 924 from 1990-1994 purporting to show that 70% of those prosecuted were members of a minority racial or ethnic group. The statistics do not address whether similarly situated whites were not prosecuted. Given the procedural posture of this case, we need not resolve the difficult question as to when raw data demonstrate a statistical disparity sufficient to trigger the need for a hearing. See Pe agar cano- ___ _____________ Soler, 911 F.2d at 837-38.  _____ -21- of the North Providence Police Department committed perjury at the first trial when testifying as to why he did not fingerprint the firearm that was seized from Gary. In Gary's first trial, in response to a question on re-direct examination as to why he did not attempt to recover fingerprints, he answered: "As far as the size of the gun -- the surface of the weapon, also the people involved in the case both had gloves on." (emphasis added). On __________________ re-cross, Arzoomanian hedged: Q. And you didn't bother to attempt to lift a print in this case because this man had gloves on; is that your testimony? A. Well, there were gloves found at the scene and gloves found in the vehicle also. At the second trial, however, Arzoomanian testified that after the arrest, but before the first trial, he learned that the gloves actually belonged to rescue personnel. He explained: "You asked the reason why I didn't print the weapon. I said because he had gloves on. And I found out later, he didn't. At that point, the evidence was handled by too many people." As Gary's counsel ably emphasized during cross-examination, Arzoomanian's testimony in the two proceedings was inconsistent. Gary asserts that Arzoomanian therefore committed perjury. Arzoomanian's testimony in the second trial did differ in a troubling way from that given in the first trial. His explanation of the inconsistency is weak because at the first trial he testified that Gary actually had worn gloves at the time of arrest -- not that he mistakenly believed at the time of -22- arrest that Gary was wearing gloves. However, it is axiomatic that inconsistent testimony is not per se perjurious. See United ______ ___ ______ States v. Dunnigan, __ U.S. __, 113 S. Ct. 1111, 1116 (1993) ("A ______ ________ witness testifying under oath or affirmation [commits criminal perjury] if she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather ______________ than as a result of confusion, mistake or faulty memory.") (emphasis added). The defendant neither asked the trial court to make any findings of perjury, nor moved for a mistrial on that basis. We decline defendant's invitation to make a finding of willful intent to provide false testimony based solely on an inconsistency.  Moreover, because Gary's first trial did not result in a conviction, he was not prejudiced even if Arzoomanian testified falsely. Cf. Kyles v. Whitley, __ U.S. __, 115 S. Ct. 1555, 1565 ___ _____ _______ n.7 (1995) ("[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.") (quoting United ______ States v. Agurs, 427 U.S. 97, 103 (1976)). Here, there is ______ _____ neither a conviction nor any evidence that indicates that the prosecution intentionally used perjured testimony. The first trial ended with a hung jury, and Gary received a second trial at which he was fully able to impeach Arzoomanian with his inconsistent testimony at the first trial. In order to bootstrap an allegation of prejudice stemming from Arzoomanian's testimony, -23- Gary argues that his second trial was barred by the Double Jeopardy Clause. This suggestion that double jeopardy prohibits a second trial because of the unknowing presentation of purportedly perjured testimony by a prosecutor is wholly unsupported by case law. Indeed, courts have held that prosecutorial misconduct must rise to an egregious level for double jeopardy to bar a retrial. A defendant cannot be retried only "where the misconduct of the prosecutor is undertaken . . . to prevent an acquittal that [he] believed at the time was likely to occur in the absence of his misconduct." United States v. Wallach, 979 _____________ _______ F.2d 912, 916 (2d Cir. 1992) (holding that prosecutorial misconduct bars retrial after conviction overturned because of perjured testimony only where this stringent standard met), cert. _____ denied, __ U.S. __, 113 S. Ct. 2414 (1993); see also Oregon v. ______ _________ ______ Kennedy, 456 U.S. 667, 679 (1982) (retrial after defense moves _______ for mistrial barred by double jeopardy only where "the conduct giving rise to the successful motion . . . was intended to provoke the defendant into moving for a mistrial"); United States _____________ v. Cartagena-Carrasquillo, No. 94-1235, slip op. at 17-19 (1st ______________________ Cir. Dec. 1, 1995) (when no evidence of prosecutorial misconduct, defendant's successful motion for mistrial does not trigger double jeopardy). In this case, there is absolutely no evidence to buttress a finding of deliberate prosecutorial misconduct, and, at worst, Arzoomanian's alleged perjury related to a -24- collateral matter. Therefore, the Double Jeopardy Clause did not prohibit Gary's second trial and subsequent conviction. F. Application of Sentencing Guidelines  F. Application of Sentencing Guidelines  Gary asserts that the trial judge erred in calculating his sentence under U.S.S.G. 4B1.4. This provision determines the offense level and criminal history category of persons who are subject to an enhanced sentence under the ACCA, 18 U.S.C.  924(e). Gary does not contest that he is an armed career criminal. Rather, he argues that the trial judge incorrectly applied U.S.S.G. 4B1.4(b)(3)(A) to arrive at an offense level of 34 when she should have used 4B1.4(b)(1) to arrive at a lower level.8 We review questions of interpretation under the  ____________________ 8 U.S.S.G. 4B1.4 provides in pertinent part: (a) A defendant who is subject to an enhanced sentence under the provisions of 18 U.S.C. 924(e) is an armed career criminal. (b) The offense level for an armed career criminal is the greatest of: (1) the offense level applicable from Chapters Two and Three; or (2) the offense level from 4B1.1 (Career Offender) if applicable; or (3)(A) 34, if the defendant used or 34 possessed the firearm or ammunition in connection with a crime of violence or controlled substance offense, as defined in 4B1.2(1), or if the firearm possessed by the defendant was of a type described in 26 U.S.C. 5845(a)[]; or (B) 33, otherwise.[ ] 33 -25- guidelines de novo. See United States v. Fiore, 983 F.2d 1, 2 ________ ___ ______________ _____ (1st Cir. 1992), cert. denied, __ U.S. __, 113 S. Ct. 1830 _____________ (1993). U.S.S.G. 4B1.4 instructs the sentencing judge to select the offense level that is the "greatest" of three categories. First, there is the offense level applicable from the underlying offense, which here is U.S.S.G. 2K2.1 dealing with unlawful possession of a firearm. As Gary had at least two prior felony convictions of either a crime of violence or a controlled substance offense, he would receive a minimum offense level of 24 under this provision. Because Gary "used or possessed" the firearm "in connection with" another felony offense (i.e., breaking and entering), which results in an increase of four levels under U.S.S.G. 2K2.1(b)(5), Gary's presentence report calculated his base offense level at 28. PSR 14-15. The report then added a three-level victim-related adjustment for assaulting a police officer pursuant to U.S.S.G.  3A1.2(b) to reach an adjusted offense level of 31. PSR 20. Gary disputes this interpretation of the guidelines. This Court recently held that use of a firearm in an assault and battery warranted the four-level enhancement under U.S.S.G. 2K2.1(b)(5). United States v. Sturtevant, 62 F.3d 33, 34 (1st _____________ __________ Cir. 1995) (per curiam). Gary's possession of a firearm during the breaking and entering similarly qualifies as possession in connection with another felony and would require enhancement to level 28 were we to find that 2K2.1 controls. Thus, including -26- the victim-related adjustment, the correct underlying offense level "from Chapters Two and Three" of the guidelines was 31. U.S.S.G. 4B1.4(b)(1). The second category, which would adopt the offense level from U.S.S.G. 4B1.1, is not applicable here. U.S.S.G.  4B1.1 does not apply because the "instant offense" (i.e., felon- in-possession of a firearm) is not a crime of violence. See ___ U.S.S.G. 4B1.2 comment n.2; United States v. Doe, 960 F.2d 221, _____________ ___ 226 (1st Cir. 1992). The third category directs the court to adopt an offense level of 34 if the "defendant used or possessed the firearm or ammunition in connection with a crime of violence" or 33 in all other cases. Because the judge must select the greatest of the three categories, 33 is the minimum "default" _______ offense level available under this provision without a downward adjustment for acceptance of responsibility. See United States ___ _____________ v. George, 56 F.3d 1078, 1086 (9th Cir.), cert. denied, __ U.S. ______ ____________ __, 116 S. Ct. 351 (1995). Gary's arguments for an offense level any lower than 33 are misplaced. Finding that Gary possessed the firearm in connection with a violent crime (i.e., breaking and entering), the trial judge adopted 34 as the offense level pursuant to  4B1.4(b)(3)(A).9 The court calculated the guidelines sentencing  ____________________ 9 At Gary's sentencing, the trial court held that "the possession of a gun must be found to have either been used or to have facilitated the commission of another offense" and determined that Gary's possession of a firearm facilitated the commission of the breaking and enterings.  -27- range to be 262-327 months (offense level 34, criminal history category VI) and imposed a sentence of 290 months. Gary contests the trial court's interpretation of U.S.S.G. 4B1.4(b)(3)(A). Because a felon-in-possession charge is not itself a violent crime, see Doe, 960 F.2d at 226, Gary argues that the court ___ ___ should not have imposed an offense level of 34. He also contends that the breaking and entering charge cannot be used as the predicate violent crime because there is an insufficient "nexus" between the firearm and the alleged state offense. Making a determination under U.S.S.G. 4B1.4(b)(3)(A) involves a two-step inquiry. First, the court must decide whether the predicate offense is a violent felony. Second, the court must consider whether the defendant used or possessed a firearm in connection with that violent predicate offense. In making the first inquiry, the court is to employ "a formal categorical approach" irrespective of the actual factual circumstances of the underlying offense. Taylor v. United ______ ______ States, 495 U.S. 575, 600 (1990) (holding that court must look to ______ statutory definition of ACCA predicate offenses). To determine what constitutes a violent crime under U.S.S.G. 4B1.4(b)(3)(A), the court must turn to the definition provided in 4B1.2(1). "[That] guideline proceeds to define as a crime of violence any offense which 'otherwise involves conduct that presents a serious potential risk of physical injury to another.'" Fiore, 983 F.2d _____ at 4 (quoting U.S.S.G. 4B1.2(1)(ii)). In that case, we held that a prior conspiracy conviction for burglary of a commercial -28- premise was a violent crime for purposes of the career offender guideline, U.S.S.G. 4B1.2.10 Fiore, 983 F.2d at 4-5. _____ Breaking and entering similarly is a violent crime under U.S.S.G. 4B1.4. Cf. United States v. Patterson, 882 F.2d 595, 602 (1st ___ _____________ _________ Cir. 1989) (holding that breaking and entering as defined in Massachusetts is violent crime because unauthorized entry of premises of another is a "crucial factor" in determining applicability of catch-all provision of ACCA), cert. denied, 493 ____________ U.S. 1027 (1990).  With regard to the second part of the inquiry, the trial court found that the defendant possessed a firearm in connection with the breaking and entering. Here, the court is to consider the facts to determine whether there is a sufficient nexus between possession of the firearm and commission of the underlying offense. See United States v. Samuels, 970 F.2d 1312, ___ _____________ _______ 1316 (4th Cir. 1992) (determining whether firearm was used "in connection with" crime of violence "requires the sentencing court to consider the factual circumstances surrounding the [18 U.S.C.] 922(g) offense.").  In construing a similar guidelines provision, U.S.S.G. 2K2.1(b)(5), we have held that "the phrase 'in connection with' should be interpreted broadly and [ ] where a defendant's  ____________________ 10 We also note that in Fiore, as here, the commercial burglary _____ occurred in Rhode Island, which defines burglary, in part, as breaking and entering a shop with the intent to commit robbery or larceny. 983 F.2d at 4 n.6; see also R.I. Gen. Laws 11-8-4 ________ (1994). This offense is a felony punishable by ten years imprisonment. R.I. Gen. Laws 11-8-4.  -29- possession of a firearm aids or facilitates the commission of another offense, the requisite link is present." United States _____________ v. Thompson, 32 F.3d 1, 7 (1st Cir. 1994). In Sturtevant, 62 ________ __________ F.3d at 33-34, we found that a felon who assaulted a victim with his hands but carried a concealed shotgun used the firearm "in connection with" the offense of assault and battery. This is because "the weapon provides an added sense of security and has a substantial potential for use in the course of the particular crime in question." Id. at 34; United States v. Brewster, 1 F.3d ___ _____________ ________ 51, 54-55 (1st Cir. 1993) (selling drugs and automatic weapon to undercover agent satisfied "in connection with" requirement of U.S.S.G. 2K2.1(b)(5)). We see no reason to treat the identical "in connection with" language in U.S.S.G. 4B1.4(b)(3)(A) differently from that of 2K2.1(b)(5). We therefore have no difficulty upholding the trial court's findings that Gary possessed the firearm "in connection with" the breaking and entering. Gary and Hopkins broke into at least two commercial establishments. When arrested, both men were in possession of firearms, and merchandise from one of the stores was found in Gary's car. The trial court found that Gary and Hopkins armed themselves when they decided to commit the breaking and entering for the purpose of facilitating that crime. "[W]e review the court's factfinding for clear error, giving due deference to the court's application of the guidelines to the facts." Thompson, 32 F.3d at 4 (citing 18 U.S.C. 3742(e)). ________ -30- There was ample support for the trial judge's findings of fact, and we affirm Gary's sentence under U.S.S.G. 4B1.4.11 III. CONCLUSION III. CONCLUSION __________ For the reasons stated herein, the conviction and sentence of Raymond J. Gary are AFFIRMED. AFFIRMED ________  ____________________ 11 Subsequent to oral argument in this case, the Supreme Court issued an opinion in Bailey v. United States, __ U.S. __, 64 ______ _____________ U.S.L.W. 4039 (Dec. 6, 1995), which defined the word "use" for purposes of 18 U.S.C. 924(c)(1) (imposing five-year minimum term of imprisonment upon person who "during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm."). The Court held that a conviction under  924(c) requires the government to prove more than mere possession but rather to show "active employment of the firearm." Bailey, ______ 64 U.S.L.W. at 4041 (emphasis omitted). This decision does not, however, affect Gary's sentence. Bailey does not apply to ______ U.S.S.G. 4B1.4(b)(3)(A), which reaches offenses in which the defendant either "used or possessed" a firearm. Id.; see also ___ ________ Bailey, 64 U.S.L.W. at 4043 (recognizing that sentencing ______ guidelines may provide enhancements for mere possession of firearm during other offense). -31-