# United States Court of Appeals
## For the First Circuit

No. 12-1801

UNITED STATES OF AMERICA,

Appellee,

v.

ZAIRO RAMOS,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. José A. Fusté, U.S. District Judge]

Before

Thompson, Baldock,[*] and Lipez,

Circuit Judges.

Steven A. Feldman for appellant.
Nelson Pérez-Sosa, Assistant United States Attorney, Chief, Appellate Division, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, was on brief, for appellee.

August 13, 2014

---

[*] Of the Tenth Circuit, sitting by designation.

**LIPEZ, Circuit Judge**.  Zairo Ramos and three co-defendants were recorded on video engaging in sex acts with a fourteen-year-old girl.  In defending at trial against a charge of aiding and abetting the production of child pornography, Ramos claimed unsuccessfully that he did not know the acts were being recorded.  Invoking the insufficiency of the evidence, he presses that same argument on appeal, along with a claim that the trial judge deprived him of his right to call a key witness.

With respect to sentencing, Ramos contests the length of, and justification for, his prison term, and challenges supervised release conditions that generally forbid him from using a computer or the internet without permission from his probation officer or the court, and another supervised release condition that bars him from having any "pornographic material."

After carefully considering the record, we affirm the conviction and reject Ramos's challenges to his prison sentence. However, we agree with Ramos that United States v. Perazza-Mercado, 553 F.3d 65 (1st Cir. 2009), requires us to vacate the internet, computer, and pornography supervised release conditions.  Under Perazza-Mercado, these conditions are not reasonably related to Ramos's characteristics and history, and thus deprive him of more liberty than reasonably necessary to achieve the goals of sentencing.  There remain several narrower computer and internet restrictions that Ramos did not challenge on appeal.

In 2010, KMV,[1] then 14, asked a friend of her mother's if he knew anyone in their housing project who had a computer and Internet access.[2]  KMV had known her mother's friend, Félix Iván Rodríguez-Acevedo, since she was seven or eight and considered him "like my uncle."  Rodríguez-Acevedo introduced KMV to Rey Vilanova-Delgado ("Vilanova"), a resident on another floor of her building.  Through this introduction, KMV was able to use Vilanova's computer to check social-networking websites, lounge in his apartment playing video games, and watch movies.  She told investigators that Vilanova and Rodríguez-Acevedo began to touch her during her visits to the apartment.  Other men also came to the apartment and engaged in sexual acts with KMV.

In February 2011, a social worker in the housing project learned of the sexual contact between KMV and Vilanova.  Other neighbors had heard this rumor as well; they reacted by beating Vilanova with a baseball bat.  While Vilanova recovered in the hospital, his mother turned over to the social worker a box of sexually-explicit photos, along with various VCR and DVD recordings.  Investigators from the cyber crimes unit of the

---

[1] Though KMV was identified often by name in the trial, we refer to her by her initials.

[2] We recount the essential facts in the light most favorable to the jury's verdict, see, e.g., United States v. Polanco, 634 F.3d 39, 40 (1st Cir. 2011), with further factual recitation as necessary in the analysis.

Department of Homeland Security interviewed Vilanova, and they searched some of his electronic devices after he signed a form consenting to the searches.

Among the recordings turned over to police were three videos, shot from different angles, of an incident in May or June of 2010.[3] In the videos, Ramos and co-defendants Rodríguez-Acevedo, Vilanova, and Félix Javier González-Morales, engaged in sex acts with KMV. Count 1 of a superseding indictment alleged that Ramos, "while aiding and abetting" the three co-defendants in the video, "did employ, use, persuade, induce, entice or coerce" KMV to engage in "the lascivious exhibition of the genital areas" and the performance of "sexual acts, for the purpose of producing a visual depiction," in violation of 18 U.S.C. § 2251(a).[4] The

_____

[3] KMV did not recall when in that two-month period the videos were recorded. The district court informed jurors that the precise date of recording was unknown, but that it fell within the two-month period.

[4] Other counts charged Vilanova and Rodríguez-Acevedo with aiding and abetting child pornography by taking still photographs of KMV (Count 2); Vilanova and a fifth defendant, Roberto Encarnación-Ruiz, with aiding and abetting child pornography in different video of sexual activity with KMV (Count 3); Vilanova with production of child pornography for videotaping sexual activity with another minor in a separate incident (Count 4); and Vilanova and Gonzáles-Morales with possession of child pornography (Count 5 as to Vilanova, Count 6 as to Gonzáles-Morales). The co-defendants all reached plea agreements and were sentenced to prison terms of 210 months for Vilanova and 180 months each for Rodríguez-Acevedo, Gonzáles-Morales, and Encarnación-Ruiz. Encarnación-Ruiz's plea agreement allowed him to appeal the issue of whether a defense of mistake of age must be available for a defendant charged with aiding and abetting the production of child pornography under 18 U.S.C. § 2251(a). That appeal is pending, and that argument is

-4-

aiding and abetting statute, 18 U.S.C. § 2, provides that a defendant "is punishable as a principal" if he "aids, abets, counsels, commands, induces or procures" the commission of a federal crime.

At trial, Ramos conceded that he was depicted engaging in sexual acts with KMV, such as receiving oral sex, but contended that he did not know he was being filmed, and thus he could not have aided and abetted the crime of producing child pornography. The jury instructions, which are not challenged on appeal, told jurors to consider whether "the defendant was aware that recording, video recording, photographing, was taking place during the sexual conduct."[5]

At the close of the prosecution's case, Ramos moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29. The district court denied the motion, noting in its ruling from the bench that there was a video camera visible in one of the still images from the videos, and that it was "patently clear, it's beyond any reasonable doubt, that everybody in that room knew that they were being recorded, and that cameras were being used to record."

_____

not at issue in Ramos's appeal.

[5] The court further instructed the jury that it could infer Ramos knew of the recording if he was "aware of a high probability" that the incident was being recorded on video, and he "consciously and deliberately avoided learning of that fact."

Ramos then sought to call Vilanova as a witness to ask whether Vilanova had told him that the sex acts were being recorded. Vilanova asserted his Fifth Amendment right against self-incrimination, citing the pending sentencing on his plea deal in the case, possible incriminating answers that might be elicited on cross-examination, and local charges still pending for lascivious acts. The district court held that Vilanova had properly invoked the Fifth Amendment. The jury found Ramos guilty, and the court sentenced him to 188 months in prison and ten years of post-release supervision. Included in the special conditions of supervision were requirements that Ramos "shall not possess or use a computer that contains an internal, external or wireless modem without the prior approval of the Court," and that he "shall not possess or use a computer, cellular telephone, or any other device with internet accessing capability at any time and/or place without prior approval from the probation officer." Further, the court added a condition that Ramos "will not possess any pornographic material, unless approved by the probation officer." Ramos objected only to the general ban on the use of computers and the internet. He followed with this timely appeal, which includes a challenge to the ban on the possession of pornographic material.

**II.**

We review de novo Ramos's preserved claim that there was insufficient evidence that he knew the sexual conduct with KMV was

-6-

being recorded.[6]  Our task is to evaluate the evidence "in the light most favorable to the prosecution," United States v. Jones, 674 F.3d 88, 91 (1st Cir. 2012) (internal quotation marks omitted) to see if "a rational factfinder could find guilt beyond a reasonable doubt," id.  We do not re-weigh the evidence or take up the jury's credibility determinations, United States v. Polanco, 634 F.3d 39, 45 (1st Cir. 2011), nor do we place a "premium" on "direct as opposed to circumstantial evidence; both types of proof can adequately ground a conviction."  United States v. Cortés-Cabán, 691 F.3d 1, 12 (1st Cir. 2012) (internal quotation mark omitted).

Ramos's argument at trial and on appeal is largely the same:  he protested twice in the videos when it appeared someone was recording or photographing him, and it "defies logic" that someone who so strenuously objected knew there was a camera recording.  He characterizes the government's case as a mere "patchwork of surmises and guesses" about the video recordings. His argument fails.

Three overlapping videos, capturing about forty-six-and-a-half minutes of relevant content, were introduced at trial.  The first video, referred to at trial as Video A, was thirty-three-and-

---

[6] As noted, Ramos moved for a judgment of acquittal after the government's case.  Because he did not put on any evidence in his defense, he did not have to renew his motion to preserve the issue. United States v. Hernández, 218 F.3d 58, 63 n.3 (1st Cir. 2000).

a-half minutes. Ramos first appeared in that video after about two minutes of recording. Video B, the second recording, was shot from a different angle in the room. It overlapped with most of the content of Video A, and continued recording after the camera filming Video A was turned off.[7] Ramos was in the bathroom with KMV when Vilanova turned on the camera for Video B, according to trial testimony from investigator Rosa Robles Carrasquillo. Ramos argued at trial that the beginning of videos A and B do not indicate that he saw the cameras being turned on; further, he argued that there was no testimony that the cameras made noise or had recording lights to alert him that they were on.

The final recording, Video C, was thirty seconds long. It was recorded at the end of the forty-six minutes of content shown at trial, and showed Ramos at the end of the bed, dressing KMV. The video zoomed in and out on KMV's breasts. Investigator Robles, who was familiar with the layout of the apartment, testified that from the angle of the camera it appeared that the person holding it was on the bed, within a few feet of Ramos and KMV. There is no indication in Video C that Ramos said anything in response to being recorded.

About twenty-nine minutes into the recorded content, Vilanova could be seen taking still photographs of a naked KMV.

---

[7] After Video A ended, Video B recorded about thirteen more minutes of content shown at trial. The camera continued to record for about fifty more minutes, after the group was clothed.

-8-

About a minute later, KMV grabbed a camera and began to use it to take photos of the men.  When she attempted to take Ramos's photo, he said "no, not me" in Spanish.  Ramos also commented in response to being recorded a few minutes later, when Vilanova took the video camera recording Video A and used it to scan around the room.  When he did so, he zoomed in on KMV's vagina, then focused on Ramos.  Someone in the video commented that Ramos was covering himself up in response to the camera, to which Ramos replied in Spanish that he was not covering himself, "it's that this motherfucker is recording."  Video A then stopped recording.  Video B continued, capturing Ramos, Rodríguez-Acevedo, and KMV as they later danced together on the bed naked.  Seeing these videos, the jurors could easily have concluded that Ramos's purported protests showed simply that he did not want to be the focus of attention in a video that showed him committing a federal crime.

KMV's testimony provides further support for the jury verdict.  She testified that she did not realize she was being recorded on video until "almost at the end," when Vilanova grabbed the video camera for Video A and tried to record Ramos, prompting Ramos to swear.  While Ramos argues that "the cameras could not be so obvious to everyone — otherwise the victim herself would have seen them," there is ample evidence from which a jury could conclude that the defendants knew more about the cameras than KMV did.  For example, KMV testified that, before the sexual contact,

Ramos and others "would go to one side to talk among themselves," and "would start signaling themselves," indicating that the subsequent recording was part of a plan.

As the district court noted, there were gestures from Ramos and others in the video that, according to the government, revealed an awareness that cameras were on. For example, the government contended that in one series of gestures, Ramos was checking with Vilanova that the cameras were recording, and Vilanova confirmed and looked briefly at the camera recording Video A. The government asked the jury, as the factfinder, to interpret Ramos "pointing to the camera and laughing" during the exchange as circumstantial proof of knowledge. Ramos's counterargument — that Ramos was actually pointing at Vilanova and laughing — is simply an argument that the jury could consider and reject. It is not a reason to hold that no reasonable jury could have found Ramos guilty.[8] In sum, we see no reason to disturb the jury's finding of guilt.

---

[8] There also was a visible camera in a still image from one of the videos. Ramos contended that the camera seen in the still image was not one of the cameras that was recording. Even assuming Ramos is correct, the various cameras shown in the videos — such as the camera KMV and Vilanova used for still photos and the camera Vilanova grabbed that was recording Video A — support the government's theory that Ramos and the other co-defendants knew they were recording.

Ramos contends that the district court abrogated his Sixth Amendment right to call and cross-examine witnesses when it allowed Vilanova to invoke his Fifth Amendment privilege against self-incrimination. He thus "sets in tension two cardinal precepts: that a criminal defendant should have full opportunity to secure evidence in his own defense, and that a witness should be protected against being compelled to provide testimony that may incriminate him." United States v. De La Cruz, 996 F.2d 1307, 1312 (1st Cir. 1993). A defendant's right "'to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense,'" and such a right is "'a fundamental element of due process of law.'" United States v. Gary, 74 F.3d 304, 308 (1st Cir. 1996) (quoting Washington v. Texas, 388 U.S. 14, 19 (1967)). But the Sixth Amendment does not provide "an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." Id. at 308-09 (quoting Taylor v. Illinois, 484 U.S. 400, 410 (1988)) (internal quotation marks omitted). Thus we have held that a witness may invoke the Fifth Amendment if testifying might incriminate him on direct or cross-examination, despite a defendant's Sixth Amendment interests in presenting that testimony. See, e.g., Gary, 74 F.3d at 309; De La Cruz, 996 F.3d at 1312-13; United States v. Zirpolo, 704 F.2d 23, 25 (1st Cir.

1983). An appellate court reviews favorable rulings on this invocation of the Fifth Amendment privilege for abuse of discretion. See Gary, 74 F.3d at 310.

## A. The court's inquiry

After the close of the prosecution's case, Ramos sought to conduct a voir dire, without the jury present, to ask Vilanova whether he had told Ramos he was recording. Vilanova had been subpoenaed as a witness for the trial, and his attorney had argued in pretrial filings that he faced a danger of self-incrimination if he were to testify. Vilanova's attorney renewed this argument when Ramos sought the voir dire, highlighting the fact that Vilanova had entered a plea agreement to one count of aiding and abetting production of child pornography with respect to KMV, and one count of production of child pornography involving another minor. Awaiting sentencing by Judge Fusté, Vilanova contended that his answers on the witness stand, and potential cross-examination, could lead the court to choose a sentence longer than the seventeen years recommended in the parties' non-binding plea agreement. Vilanova also anticipated that the government might inquire about other acts on cross-examination, depending on his testimony about what he told Ramos about the recording. Vilanova's counsel pressed one additional concern, a pending "lascivious acts" case in Puerto Rico's local courts.

There was good reason for Vilanova's attorney to worry about the consequences for her client if he testified at Ramos's trial. The plea agreement's factual recitation indicated there were other times in which Vilanova participated in sex acts recorded with KMV ("[He] also admitted to having photographed and videotaped himself and others charged in the Superseding Indictment engaging in sexual intercourse with 'KMV' on different dates" (emphasis added)). The recitation further stated that there were between seven and ten videos found by investigators of Vilanova engaging in sex acts with another minor. Special Agent Vanessa Blanco had testified briefly about these videos at Ramos's trial, stating that the other minor never knew she was being recorded.

Vilanova had also turned over computer hard drives during the investigation with what a forensic analyst testified was about one hundred thousand videos that Vilanova recorded.[9] His collection of images of child pornography included scenes of bestiality.

In the district court's inquiry into Vilanova's invocation of the Fifth Amendment privilege, the prosecutor provided a specific example of a potential subject of impeachment. If Vilanova testified that he did not tell Ramos he was recording and that he thought Ramos did not know about the cameras, the

_____

[9] Vilanova had a habit of recording all aspects of his life, according to testimony from the investigators.

prosecutor stated that he would then pursue a cross-examination based on the obvious signs that cameras were recording. Vilanova's attorney characterized this hypothetical as deeply harmful for her client at sentencing:

> If my client stands here, okay, and says 'No, I did not tell Mr. Zairo [Ramos] that he was being recorded, the Court has already said that the Court understands that that is obvious [that everyone knew they were being recorded]. What credibility will my client have?

After further probing by the court, it thought that this concern had merit: "The more I think about it, there is a good possibility . . . that Rey Vilanova, out of ignorance, out of loyalty . . . to the defendant on trial, out of fear, out of whatever reason, may screw up badly if he testifies." If this were to happen, the court noted, "I may give him an adjustment [at his sentencing] for obstruction of justice." The court added that there was also a risk "that transcends this case into local cases without a doubt," and that there was further risk of information that could change the sentence on the non-binding plea deal "because of other conduct that I am not aware of."[10]

---

[10] Vilanova's counsel provided further details to the court in an ex parte proffer that was then sealed. Because the proffer was not transcribed and included in the record on appeal, see Fed. R. App. P. 10(a)-(b), we analyze the issue only on the available record.

**B. Analysis**

"[T]he convicted but unsentenced defendant retains a legitimate protectable Fifth Amendment interest as to matters that could affect his sentence." De La Cruz, 996 F.2d at 1312 (internal quotation marks omitted). Here, nothing in Vilanova's plea agreement with the government would prevent the court from using Vilanova's possible answers against him at sentencing, and there is ample evidence that testimony from Vilanova — particularly on a cross-examination that might inquire about video-recording sexual acts — had a risk of linking him to other sex-related crimes.[11] Thus it is clear that the district court did not abuse its discretion in determining that Vilanova had a real fear of worsening his chances for a lenient sentence, admitting to other misconduct, or incriminating himself with respect to the lascivious acts case pending in local courts.

Ramos's counterarguments are unconvincing. He contends that the court's failure to do a question-and-answer voir dire of Vilanova is reversible error. Ramos casts the district court's actions as allowing Vilanova to invoke "the Fifth Amendment on a wholesale scale," and "fail[ing] to either make a particularized

---

[11] In some circumstances, a trial judge may be able to "reconcile the defendant's right to present witnesses with a witness's privilege against self-incrimination by limiting the scope of the latter's testimony." Zirpolo, 704 F.2d at 26. Ramos does not argue on appeal that such a step was possible. Thus our focus is on his general claim that the district court erred in its analysis of Vilanova's potential for self-incrimination.

finding as to the applicability of the privilege or set forth its rationale."  For support, Ramos cites United States v. Castro, 129 F.3d 226 (1st Cir. 1997), in which the panel wrote that the trial court "prudently required the parties to proceed in a question-and-answer format," id. at 228, and that the trial court "should make a particularized finding as to the applicability *vel non* of the privilege and should elucidate its rationale," id. at 230.

A district court inquires into the reasons a witness is claiming the Fifth Amendment privilege to verify that the witness is not invoking the privilege "on a blanket basis," id. at 229, and does in fact face "substantial and 'real,' and not merely trifling or imaginary, hazards of incrimination."  Marchetti v. United States, 390 U.S. 39, 53 (1968) (quoting Rogers v. United States, 340 U.S. 367, 374 (1951)).  "To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result."  Hoffman v. United States, 341 U.S. 479, 486-87 (1951).  Assessing the danger that a witness faces "is a determination for the court, not the witness, to make, and [it] is subject to the discretion of the district court."  United States v. Pratt, 913 F.2d 982, 990 (1st Cir. 1990).  In this inquiry, the court "must be governed as much by . . . personal

perception of the peculiarities of the case as by the facts actually in evidence." Hoffman, 341 U.S. at 487 (internal quotation marks omitted).

Thus it is crucial for a district court to inform its discretion through appropriate inquiries, particularly when the defendant's right to put on a defense is in tension with the Fifth Amendment privilege. There are various ways for a district court to properly inform itself of the nature of the Fifth Amendment claim. See Pratt, 913 F.2d at 990 (noting that the need for a particularized inquiry is "only a general rule"). Ramos's argument that a question-and-answer format is legally required elevates the form of the inquiry over its substance. Here it is clear that the district court carefully assessed the Fifth Amendment claim and informed its discretion appropriately.

Ramos next contends that if Vilanova's pending sentencing kept alive his Fifth Amendment interest, the trial court "could have simply and easily ordered a brief adjournment," sentenced Vilanova, "and then reconvened Ramos's trial." Ramos never asked the court to take this step, and his argument ignores the practical difficulties of such an approach.[12] Sentencing is not done on the spur of the moment. In the usual sentencing scenario, a probation officer must first identify all applicable Sentencing Guidelines

_____

[12] Vilanova's counsel actually suggested this step, but the court rejected it as "not a realistic argument," and Ramos's trial counsel offered no opinion on the issue.

-17-

and policy statements, calculate the offense level, criminal history, and available sentencing ranges, and identify relevant factors that might guide the sentencing. <u>See</u> Fed. R. Crim. P. 32(d)(1)-(2). The result of this investigation is a presentence report given to the defendant, the defendant's attorney, and the government at least thirty-five days before sentencing (though the defendant may waive this deadline). <u>Id.</u> at 32(e)(2). Both Federal Rule 32 and Local Rule 132 provide for further deadlines to provide all sides with adequate notice, including a deadline of fourteen days from the disclosure of the presentence report for any written objections to that report.

At the time Ramos sought to call Vilanova as a witness, Vilanova's sentencing was about two-and-a-half months away. Vilanova had reached a plea agreement that left certain important details subject to further investigation, such as the calculation of his criminal history. It would thus have been impractical for the court to interrupt the trial and sentence Vilanova without the benefit of a presentence report.[13] Not surprisingly, Ramos offers no authority for such an obligation, and we see no reason to impose one. <u>See</u> <u>United States</u> v. <u>Rivas-Macias</u>, 537 F.3d 1271, 1281 (10th Cir. 2008) ("Defendant cites no authority, and we have found none, suggesting a district court is required, <u>sua sponte</u>, to continue a

_____

[13] We note that such a step would not have resolved the pending local lascivious acts charges against Vilanova.

defendant's trial until a witness invoking the Fifth Amendment privilege has been sentenced.").[14]

**IV.**

Ramos claims that the district court did not adequately explain the reasons for its sentence, see 18 U.S.C. § 3553(c), and that it should have chosen a lower sentence given Ramos's "limited role in the offense" and his difficult upbringing. He asserts that the 188-month sentence was "both unreasonable and even draconian."

We review the imposed sentence in a two-step process, examining it first for procedural errors, and then for substantive unreasonableness. United States v. Politano, 522 F.3d 69, 72 (1st Cir. 2008).

## A. Procedural errors

Ramos claims two forms of procedural error: failing to explain the reasons for the sentence, and failing to adequately consider the factors in 18 U.S.C. § 3553. Because these arguments are raised for the first time on appeal, our review is for plain error. See United States v. Rivera-Gonzalez, 626 F.3d 639, 646 (1st Cir. 2010).[15]

---

[14] Ramos casts as a separate argument a claim that Vilanova could have benefitted himself by testifying honestly and accepting responsibility, and that the trial court was unlikely to punish him for any testimony. We read this as an argument that Vilanova did not face a substantial danger of self-incrimination. We have already rejected this argument.

[15] "To vacate a sentence under plain error review, four prerequisites must be established: (1) an error occurred; (2) the

Section 3553(c) requires the district court to "state in open court the reasons for its imposition of [a] particular sentence."  Here the court's sentencing guidelines calculation — a total offense level of thirty-six, and a criminal history category of I — yielded an imprisonment range of 188 to 235 months.  Because this range is greater than twenty-four months, the district court had to state the "reason for imposing a sentence at a particular point within the range."  18 U.S.C. § 3553(c)(1).  We have held that an explanation is adequate under § 3553(c)(1) if it notes "some discrete aspect of the defendant's behavior" and ties that aspect to the goals of sentencing.  Rivera-Gonzalez, 626 F.3d at 646-47 (quoting United States v. Vazquez-Molina, 389 F.3d 54, 58 (1st Cir. 2004), vacated on other grounds, 544 U.S. 946 (2005)).  A sentencing court is required to consider relevant § 3553(a) factors, but need not address each one.  Id. at 647.  When there are gaps in the explanation for a particular sentence, "a court's reasoning can often be inferred by comparing what was argued by the parties or contained in the pre-sentence report with what the judge did."  United States v. Jiménez-Beltre, 440 F.3d 514, 519 (1st Cir. 2006).

---

error was clear and obvious; (3) the error affected the defendant's substantial rights; and (4) the error impaired the fairness, integrity, or public reputation of the judicial proceedings."  United States v. Manqual-Garcia, 505 F.3d 1, 15 (1st Cir. 2007).

Here, we can compare the presentence investigation report and the sentencing transcript to understand the district court's reasoning behind its sentence. The presentence report contained this paragraph explaining that the characteristics of the offense, and particularly the vulnerability of the victim, could justify a higher sentence:

> The Court could consider that the victim was a troubled child who lacked the guidance and protection from both parents. At the time of the offense, the victim was in fourth grade which leads us to believe she might have failed in school as a result of negligence or as a result of a learning disability. Her poor socio-economic status, her relationship with defendant [Rodríguez-Acevedo] . . . and the lack of supervision placed her in a vulnerable position. The defendants . . . took advantage of her ignorance and used her for their personal gratification. Furthermore, the defendant has no empathy for the victim and even blames her.

The next paragraph outlined mitigating factors with respect to Ramos's troubled upbringing that "might have negatively impact[ed] him and his judgment."[16] At sentencing, the court and Ramos's counsel had this exchange, which drew on both paragraphs in the presentence report about aggravating and mitigating factors:

> The Court: Thinking of the victim, a troubled child, lack of guidance, lack of parents' control, very poor academic development and achievement, probably social and learning disabilities, poor socioeconomic status —

---

[16] According to the presentence report, Ramos's father was a heroin addict and his mother died when he was a teenager. When he was 20, his father died while incarcerated, after having been arrested in a federal drug case. His brother, also arrested in the federal case, later died in a car accident.

[Ramos's counsel]: That also applies to my client, Your Honor, in the next paragraph.

The Court:  Right.  He's an adult.

[Ramos's counsel]:  Yes.  And that's why he's here. He's going to face —

The Court:  I know.

[Ramos's counsel]:  — a very, very long sentence, Your Honor.

After that exchange, the court stated that it would "do what we did with the other two [co-defendants]" and "use the lower end of the guidelines."  At the time, co-defendants Rodríguez-Acevedo and Vilanova had been sentenced to 210 and 180 months respectively, while Gonzáles-Morales, the fourth co-defendant appearing in the videos with Ramos, was awaiting sentencing.

The court's comments, in the context of the parties's arguments and the presentence report, offer several reasons for the chosen sentence.  The court considered the nature and seriousness of the offense by highlighting various ways that the victim was vulnerable, see 18 U.S.C. § 3553(a)(1)&(2), it acknowledged the defendant's claim of his own troubled upbringing, see id. at (a)(1), and it returned to a fundamental distinction between offender and victim — "He's an adult" — to justify a sentence at the low end of the recommended range.[17]  Further, the court noted

_____

[17] The court also heard from Ramos's counsel at sentencing about his acceptance of responsibility, and his contention that he had a lesser role.  It responded to the latter argument, noting that "there is no such thing as better or worse in this kind of

-22-

that in doing so it was treating Ramos in a similar fashion to other co-defendants on the videos who had pleaded guilty.  See id. at (a)(6).[18]  We see no procedural mistake in the district court's explanation under the applicable plain-error review standard. Indeed, even if Ramos had timely objected and thus preserved the issue for closer scrutiny, we would still find no error.

## B.  **Substantive unreasonableness**

Ramos also attacks the substantive reasonableness of the sentence, arguing that he had a "difficult background and limited role in the offense," and the court never considered "a sentence that was sufficient, but not greater than necessary," 18 U.S.C. § 3553(a).  He reiterates that he did not know he was being recorded, that there was no evidence he sought to retain or distribute the recordings, and that, unlike Vilanova, he did not possess any child pornography.

A district court has wide discretion in its sentencing decisions.  The "linchpin of a reasonable sentence is a plausible sentencing rationale and a defensible result."  United States v. Martin, 520 F.3d 87, 96 (1st Cir. 2008).  Here, Ramos's argument

---

thing."

[18] The desire to avoid unwarranted disparities among the case's co-defendants was also discussed at a sidebar off the record.  When back on the record, the court stated that the purpose of that sidebar discussion was "to achieve some sort of consistency between the [defendant's and co-defendants'] sentences.  And I decided the best way to do it is the lower end of the guidelines in all three cases."

about his lack of knowledge of the recording is at odds with what we have already held was a sufficiently supported jury verdict. His arguments for leniency based on his background, and on his lesser involvement when compared to Vilanova, "may be well-founded, but they are ultimately unavailing" because district courts have the latitude to "emphasize the nature of the crime over the mitigating factors," and such a "choice of emphasis . . . is not a basis for a founded claim of sentencing error." United States v. Zapata, 589 F.3d 475, 488 (1st Cir. 2009) (internal quotation marks omitted).

## V.

Ramos objected at sentencing to limitations on his use of a computer and his use of the internet during the ten-year term of supervised release that would follow his prison term of fifteen years and eight months. Because he preserved the issue, we review his arguments on appeal for abuse of discretion. Perazza-Mercado, 553 F.3d at 69.

Ramos also raises on appeal a new argument that the court's prohibition on all pornography must be vacated. We review that claim for plain error. Id. at 75.

## A. The district court sentencing

Ramos's presentence report recommended that he "not have access" to the internet "at his place of residence, unless approved" by probation. This condition appears to have been

-24-

redundant in light of a second, broader condition proposed in the report that Ramos "shall not possess or use a computer, cellular telephone, or any other device with internet accessing capability, at any time or place without prior approval from the probation officer."

At sentencing, the district court imposed the proposed ban on possessing or using a computer, cell phone, or other device that can access the internet without prior approval from the probation officer, thereby covering the presentence report's proposed general ban on internet access at home. The court also added two conditions that ban using or possessing computers without court approval, thereby suggesting that approval of such uses could come either from a probation officer or the court.[19] Other conditions that are not challenged on appeal restrict Ramos's ability to be near minors,[20] provide for sex offender treatment, and

---

[19] Specifically, condition 17 barred possessing or using a computer that contains "an internal, external, or wireless modem" without prior court approval, and condition 18 barred "possessing or us[ing] any computer" without prior court approval in connection with authorized employment. It would appear that the computer and internet bans in these three imposed conditions — the one adopted from the presentence report and the two added at sentencing — could have been boiled down to one condition: a ban on possessing or using any computer, or possessing or using any device with the ability to access the internet, unless approved by a probation officer or the court.

[20] These include a ban on Ramos working with children and a requirement that he not reside or loiter within 1,000 feet of any area or event frequented by minors.

further restrict computer and internet use in the event that Ramos is allowed to use a computer or the internet.[21]

The court gave its only justification for the computer and internet conditions after Ramos's counsel objected to them. Ramos's counsel contended that "the evidence at trial did not show [he was] either using a computer or using the internet or using any sort of device like that." The court replied:

> It's that when you commit this kind of offense and the offense involves minors, usually reasonable people think that there may be a connection between that kind of conduct and the use of the internet for other purposes which are also sexually oriented or in that sense relate to the type of offense. And that's why those conditions are in there.
> Of course . . . let's suppose he gets a job and he's going to work in a commercial establishment or something. All that can be arranged. But the condition has to be around. There's no question about it.

The court also added a further condition, not mentioned in the presentence report, that Ramos "will not possess any pornographic material unless approved by the probation officer, which of course they won't." Ramos's attorney did not object to this condition. The court did not explain its reasoning for the pornography ban.

---

[21] Ramos must consent to computer monitoring and filtering systems on any computer he owns or controls; to searches of any computer equipment; and to searches of any other electronic or data-storage devices upon reasonable suspicion. Also, if Ramos were permitted to use the internet at some point, he would have to keep a daily log of all websites he accessed for reasons outside of authorized employment, and to make such a log available to his probation officer.

## B. The internet and computer-use conditions

The purposes of supervised release mirror the purposes of sentencing generally: "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," 18 U.S.C. § 3553(a)(2)(A); "to afford adequate deterrence to criminal conduct," id. § 3553(a)(2)(B); "to protect the public from further crimes of the defendant," id. § 3553(a)(2)(C); and the need "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner," id. § 3553(a)(2)(D).

A court applies 18 U.S.C. § 3583(d) and U.S.S.G § 5D1.3(b) to review special conditions. This statute and section of the sentencing guidelines require "that special conditions cause 'no greater deprivation of liberty than is reasonably necessary' to achieve the goals of supervised release," and "that the conditions be 'reasonably related' both to these goals and to the 'nature and circumstances of the offense and the history and characteristics of the defendant,'" Perazza-Mercado, 553 F.3d at 69 (quoting 18 U.S.C. § 3583(d)(1)-(2)). See also 18 U.S.C. § 3553(a)(1).

In Perazza-Mercado, we reviewed a special condition that barred the defendant from using the internet at home during his fifteen years of supervised release. The defendant, convicted of unlawful sexual contact with a minor, had no history of using the

-27-

internet to view child pornography or contact minors inappropriately, and did not use the internet in committing his crime. He thus contended that such a ban would not advance the sentencing goals of deterrence or protecting the public, and instead would unnecessarily harm his ability to use the internet for purposes related to rehabilitation. 553 F.3d at 70.

In our analysis, we noted that "an undue restriction on internet use renders modern life — in which, for example, the government strongly encourages taxpayers to file their returns electronically, where more and more commerce is conducted on-line, and where vast amounts of government information are communicated via website — exceptionally difficult." Id. at 72 (internal quotation marks omitted). A total ban on internet use at home was thus inconsistent with the vocation and education goals of supervised release. It prevented, for example, such vital tasks as looking for job postings when at home. We were also mindful that a defendant's supervised release conditions only take effect after completion of the prison sentence. Id. at 73. There is ample reason to believe that it will become harder and harder in the future for an offender to rebuild his life when disconnected from the internet at home.

Our opinion in Perazza-Mercado further relied on the availability of narrowly tailored tools for reaching the appropriate balance between monitoring an offender in order to

-28-

protect the public, while still allowing him some reasonable internet access. Just as conditions forbid a defendant from working with children as part of his job, or living or loitering near areas whether children gather, "modern technology permits[] an internet prohibition which would essentially replicate these real-world limitations." Id. at 74. Modern monitoring techniques include software installed on a computer to track usage, as well as relying on data from a user's internet service provider. These are important tools for a court to consider for an offender who, as we noted repeatedly in Perazza-Mercado, did not use the internet for his crime, and has not used the internet in the past for impermissible purposes, such as viewing child pornography, or contacting minors inappropriately. Given the absence of those concerns, the importance of the internet to daily life, and the availability of narrowly tailored monitoring tools, we agreed that the internet ban at home was not reasonably related to the defendant's personal characteristics or offense of conviction, and caused a greater deprivation of liberty than necessary for the goals of supervised release.[22] Id. at 73.

---

[22] Circuit courts have affirmed broad supervised-release restrictions on internet access when "(1) the defendant used the internet in the underlying offense; (2) the defendant had a history of improperly using the internet to engage in illegal conduct; or (3) particular and identifiable characteristics of the defendant suggested that such a restriction was warranted." Perazza-Mercado, 553 F.3d at 70 (citing cases).

Ramos's case raises two variations from the facts of Perazza-Mercado.[23] Here the overlapping conditions go beyond a ban on the internet at home, and instead cover any possession or use, anywhere, of a computer, or of a device with the capability to access the internet. Also, there is an attempt in this case to provide for leeway in the conditions. Ramos's condition barring use of computers or devices with internet access would allow such use with prior approval from probation; the additional internet and computer conditions have an exception if Ramos seeks prior court approval. Thus the government contends that Ramos does not face an absolute ban, "but mostly a conditional limitation."

This authority of probation or a future court to modify a sweeping ban on computer or internet use does not immunize the ban from an inquiry that evaluates the justification for the ban in the first instance. Otherwise, in the guise of delegation to a future decision-maker, sentencing courts could abdicate their responsibility to assess the compatibility of supervised release conditions with the goals of sentencing. To approve problematic conditions because a judge or a probation officer might, in her or his discretion, relax them in the future, undermines the command to

_____

[23] After more than fifteen years in prison, Ramos faces a shorter period of supervised release, ten years, than the fifteen years of supervised release in Perazza-Mercado after four years of prison. The difference in length of the supervised release terms does not alter the result here.

sentencing courts to not deprive offenders of more liberty than is necessary to carry out the goals of supervised release.

The district court did not cite evidence in the record that Ramos used a computer or the internet in any way in connection with the offense, nor did it identify past impermissible uses that justified generally barring him from using a computer or the internet for ten years.[24] We read the court's brief explanation as positing its personal belief that there may be a link between Ramos's crime and the potential for using a computer or the internet for child-pornography offenses.

Of course, access to a computer and the internet can facilitate such crimes. But the fact "[t]hat an offense is sometimes committed with the help of a computer does not mean that the district court can restrict the Internet access of anyone convicted of that offense." United States v. Burroughs, 613 F.3d 233, 243 (D.C. Cir. 2010); cf. United States v. Peterson, 248 F.3d 79, 83 (2d Cir. 2001) ("Although a defendant might use the telephone to commit fraud, this would not justify a condition of probation that includes an absolute bar on the use of telephones."). The sentencing guidelines recommend a condition

---

[24] United States v. Siegel, 753 F.3d 705 (7th Cir. 2014), provides a helpful overview and guidance for properly imposing special conditions. As part of suggested best practices, it recommends that a district court determine the appropriateness of a special condition "with reference to the particular conduct, character, etc., of the defendant, rather than on the basis of loose generalizations." Id. at 717.

"limiting the use of a computer or an interactive computer service" for a defendant convicted of a sex offense against a minor, "<u>in cases in which the defendant used such items</u>." U.S. Sentencing Guidelines Manual § 5D1.3(d)(7)(B) (2009) (emphasis added).

We note that cases in other circuits are in general accord: where a defendant's offense did not involve the use of the internet or a computer, and he did not have a history of impermissible internet or computer use, courts have vacated broad internet and computer bans regardless of probation's leeway in being able to grant exceptions. <u>Compare</u>, <u>e.g.</u>, <u>United States</u> v. <u>Crume</u>, 422 F.3d 728, 733 (8th Cir. 2005) (vacating ban on computer and internet access where the offender did not use a computer or the internet in his offense but the probation officer did have discretion to relax the ban); <u>United States</u> v. <u>Freeman</u>, 316 F.3d 386, 391-92 (3d Cir. 2003) (same), <u>with</u> <u>United States</u> v. <u>Love</u>, 593 F.3d 1, 12 (D.C. Cir. 2010) (affirming ban on internet access, where offender sent child pornography online and where probation officer would have discretion to relax the ban); <u>United States</u> v. <u>Ristine</u>, 335 F.3d 692, 696 (8th Cir. 2003) (same); <u>United States</u> v. <u>Rearden</u>, 349 F.3d 608, 621 (9th Cir. 2003) (same); <u>United States</u> v. <u>Miller</u>, 665 F.3d 114, 117, 133-34 (same, where offender received child pornography online). The district court's reasoning would impermissibly create a categorical rule allowing broad limitations on computer and internet use simply because the offense of

conviction involved child pornography.  See Perazza-Mercado, 553
F.3d at 77 ("The Sentencing Commission creates such generally
applicable conditions of supervised release, not appellate
judges.").

The government labors to fill the void of justification
for the computer and internet restrictions.  For example, it notes
that Ramos admitted to looking at adult pornography, has some
familiarity with computers, and did computer repair work in his
housing project.  "It is significant that other co-defendants
possessed child pornography in their personal computers,"[25] the
government argues, further noting that Ramos had a small reading
device (a Barnes & Noble Nook) that he apparently had reprogrammed
to function as a more general-use computer tablet.  Although the
authorities never seized and searched the tablet, the government
contends that the restrictions "were responsive to those facts," a
reference that apparently includes the unreviewed tablet.

These arguments ignore the absence of evidence of Ramos
using a computer or the internet in the commission of his crime,
and the lack of any indication that Ramos had used a computer or
the internet for illegal purposes, such as viewing child
pornography, or improperly contacting minors.  The prosecutor
released Ramos's computer to his family because there was no child

---

[25] The government appears to be referring to Vilanova and
Gonzáles-Morales, both of whom were charged in the superseding
indictment with possession of images of child pornography.

pornography found on it, and there is no indication in the record that his tablet contained child pornography, or that he likely repaired or had access to the computers of the co-defendants in this case. In short, the government's contentions are "nothing but post hoc conjecture." Burroughs, 613 F.3d at 244.

Importantly, the computer and internet conditions that Ramos did not challenge on appeal include monitoring and filtering systems, searches of any computer equipment, and searches of other electronic or data-storage devices upon reasonable suspicion. These conditions are narrowly tailored tools that further undercut the argument for any broader internet and computer ban in this case.[26] Given that these narrowly tailored conditions are already

_____

[26] The record shows inconsistency in how co-defendants were treated with respect to internet and computer bans. Ramos, Vilanova, and Rodríguez-Acevedo were sentenced on May 29, 2012, and all received broad limitations on internet and computer use without probation approval. It appears that only Ramos objected to the conditions at sentencing, and he was the only defendant in that group without a history of impermissible internet use: Vilanova had a collection of images of child pornography, and Rodríguez-Acevedo had online conversations of a sexual nature with KMV.

About two months later, co-defendants Encarnación-Ruiz and Gonzáles-Morales were sentenced. Neither one had conditions imposed that banned using the internet or computers without probation approval, despite presentence reports that had recommended such conditions. In Encarnación-Ruiz's case, he filed written objections to the initial presentence report. He contended, as Ramos did, that the internet and computer bans were not reasonably related to his offense or characteristics. It appears the probation officer agreed with Encarnación-Ruiz's objections because the challenged conditions did not appear in the final presentence report submitted to the court. For Gonzáles-Morales, his presentence report stated that a digital storage card that he owned had two videos of child pornography. The record does not show that he ever objected to the presentence report's

-34-

in place, there is no need for us remand to the district court, as we did in <u>Perazza-Mercado</u>, so that it might devise appropriate restrictions on Ramos's computer and internet use. We thus vacate the challenged restrictions to the use of a computer or the internet — specifically, the additional supervised release terms numbered 9, 17, and 18.[27]

## C.  **The ban on pornography**

At sentencing, the district court added a special condition, not sought by the government, that Ramos "will not possess any pornographic material unless approved by the probation officer, which of course they won't." The court did not separately explain the reason for that condition, and the defendant did not ask for an explanation. We think it reasonable to infer, however, that the court saw some unstated connection between viewing adult pornography and the child pornography offenses here. In that sense, the court probably drew on the justification it offered for the sweeping ban on internet and computer use — "when you commit this kind of offense and the offense involves minors . . . there

---

recommended ban on using any computer or devices with internet capability. Yet no such condition appears in his judgment of conviction.

These inconsistencies in the imposed sentencing conditions for the co-defendants further undermine the government's rationale for imposing on Ramos the sweeping bans on computer and internet use.

[27] We further note that probation can move to modify conditions of supervised release, <u>see</u> 18 U.S.C. § 3583(e)(2), should there be a change in circumstances to justify additional conditions.

may be a connection between that kind of conduct and the use of the internet for other purposes which are also sexually oriented or in that sense relate to the offense."  Again, the court cited no evidence specific to this case or in behavioral studies supporting the connection that the court suggests "may" exist between watching adult pornography and the production of child pornography.

In Perazza-Mercado we also vacated, on plain-error review, a ban on adult pornography because the ban imposed, in the absence of any evidentiary support, was not reasonably related to the nature and circumstances of the offense and to the history and characteristics of the defendant.  553 F.3d at 76.  "A condition with no basis in the record or with only the most tenuous basis, will inevitably violate [18 U.S.C. §] 3585(d)(2)'s command that such conditions involve no greater deprivation of liberty than is reasonably necessary."  Id. (internal quotation marks omitted).[28] Here, the ban on any pornographic material, contained in condition 14 of the additional supervised release conditions, must be vacated

---

[28] We recognize that the presentence report indicates that Ramos, unlike the defendant in Perazza-Mercado, viewed adult pornography in the more recent past.  However, the government does not argue that such a fact distinguishes this case, and there is no discussion of this point in the district court's sentencing explanation.  Moreover, nothing in the record justifies, as far as we can tell, the conclusion that viewing adult pornography was a habit that "contributed to his offense or would be likely to do so in the future."  Perazza-Mercado, 553 F.3d at 76.

for the same reason.[29]  However, the district court may revisit this issue at a resentencing limited to a reconsideration of the pornography ban.  If it chooses to reimpose such a condition, it must explain its basis for doing so and its grounding in the present or an expanded record.[30]

## VI.

For the reasons stated, we **<u>affirm</u>** the conviction and sentence of imprisonment, and **<u>vacate</u>** the additional terms of supervised release numbered 9, 14, 17, and 18.  We **<u>remand</u>** for the district court to modify the judgment in accordance with this opinion, and to revisit the pornography ban if it wishes, subject to the requirements stated herein.

**<u>So ordered.</u>**

---

[29] The government contends that this ban is akin to the condition challenged in <u>United States</u> v. <u>Sebastian</u>, 612 F.3d 47 (1st Cir. 2010).  That condition barred the offender from possessing pornography if such a condition were part of a sex offender treatment program.  As the court in <u>Sebastian</u> noted, such a condition "does little more than require [the defendant] to follow the rules of any program he may be required to attend."  <u>Id.</u> at 52.  Here the ban on pornography is for the ten-year probation term and does not depend on being part of a treatment program.  Thus the ban falls within the holding of <u>Perazza-Mercado</u>.

[30] Because we vacate the condition as inadequately supported, we do not reach Ramos's argument that the ban on "pornographic material" is unconstitutionally vague.