# United States Court of Appeals
## For the First Circuit

No. 14-1566

UNITED STATES,

Appellee,

v.

JORGE LUIS MENDEZ, a/k/a Daniel,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. Pérez-Giménez, U.S. District Judge]

Before

Howard, Chief Judge,
Selya and Thompson, Circuit Judges.

Kerry A. Haberlin on brief for appellant.
Leslie R. Caldwell, Assistant Attorney General, Sung-Hee Suh, Deputy Assistant Attorney General, Scott A.C. Meisler, Criminal Division, Appellate Section, U.S. Department of Justice, and Hope S. Olds, Senior Trial Attorney, Human Rights and Special Prosecutions Section, Criminal Division, on brief for appellee.

September 11, 2015

**THOMPSON**, **Circuit Judge**.  Jorge Luis Mendez, who was indicted in connection with a vast conspiracy to provide identification documents to undocumented aliens in the United States, pled guilty to various charges.  He was sentenced to just over six years in prison.  That sentence forms the basis for this appeal.  Mendez contends that it is too long and that various errors were made by the sentencing judge when handing it down.  Because our review of his claims is frustrated by an insufficient explanation from the district court, we vacate and remand for resentencing.

## BACKGROUND

### A. The Conspiracy

Mendez, along with fifty-plus cohorts, was part of a scheme to supply undocumented aliens in the continental United States with the identities of United States citizens residing in Puerto Rico.[1]  The conspiracy extended over the course of almost three years (April 2009 to January 2012) and spanned the country, with its members operating out of various states (Massachusetts, Illinois, Pennsylvania, and Ohio, to name a few) and Puerto Rico.

---

[1] The facts are derived from the change-of-plea colloquy, the undisputed portions of the presentence investigation report, and the transcript of the disposition hearing.  See United States v. Almonte–Nuñez, 771 F.3d 84, 86 (1st Cir. 2014); United States v. Del Valle–Rodríguez, 761 F.3d 171, 173 (1st Cir. 2014).

There were distinct jobs to be done, with Puerto Rico-based Mendez operating as a "Savarona Supplier." The Savarona Suppliers would procure "unlawful document sets," a term defined in the indictment and presentence investigation report (PSR) as "Puerto Rico-issued birth certificates and corresponding U.S. Social security cards (both pertaining to the same Puerto Rican person)," as well as individual fraudulently obtained documents (termed "unlawful documents"), like driver's licenses and voter registration cards.

Savarona Suppliers, like Mendez, then transmitted the documents to identity brokers (who were the ones bringing in the customers) and the brokers would then sell the sets for $700 to $2,500 a piece, with more money required for additional individual documents. The customers were undocumented aliens and others residing in the continental United States.

## B. The Indictment

In December 2011, Mendez, along with fifty-two co-defendants, was named in a fifty-count indictment. Mendez was picked up the next month. At the time of his arrest, he had in his possession numerous identity documents in other people's names, including eleven Puerto Rico birth certificates, ten social security cards, one Puerto Rico driver's license, one Puerto Rico electoral card, and the personal identifying information (including social security numbers) for another eight individuals.

The vast majority of Mendez's co-defendants ended up pleading guilty and, after some failed negotiations, Mendez did the same. Six days before trial was to commence, Mendez pled guilty without a written plea agreement to Count 1, conspiracy to possess, produce, and transfer identification documents in violation of 18 U.S.C. § 1028; Count 2, conspiring to encourage an alien to reside in the United States in violation of 8 U.S.C. § 1324; and Counts 22, 23, and 26, aggravated identity theft, in violation of 18 U.S.C. § 1028A.

## C. Presentence Dispute

A debate about Mendez's appropriate sentencing range arose prior to the sentencing hearing with respect to Counts 1 and 2.[2] All involved (probation and parties) agreed that Counts 1 and 2 should be grouped, meaning that the governing offense level would be the "the highest offense level of the counts in the Group." USSG § 3D1.3(a). The question was whether Count 1 or 2 supplied the highest offense level.

The probation office thought Count 1 (conspiracy to commit identity fraud) did. The computation for Count 1, as evidenced by the PSR, went as follows. The relevant guidelines

---

[2] There was no controversy surrounding the aggravated identity theft counts (Counts 22, 23, 26). The parties agreed that a mandatory two-year term for those counts was to run consecutive to any sentences on Counts 1 and 2 per 18 U.S.C. § 1028A(a)(1) and USSG § 2B1.6. Mendez does not appeal that aspect of his sentence.

- 4 -

provision, USSG § 2L2.1(a), provided a base offense level of 11. That provision calls for the offense level to be increased by various levels based on the number of documents involved. USSG § 2L2.1(b)(2). Positing that the offense here involved 100 or more documents, the PSR increased Mendez's base offense level by 9. It then recommended a 3-level enhancement because Mendez was a manager or supervisor in a criminal activity involving five plus participants pursuant to USSG § 3B1.1(b). Assuming a 2-level decrease for acceptance of responsibility under USSG § 3E1.1(a), the PSR projected the total offense level of 21 for Count 1. Given Mendez's criminal history, this yielded a guideline sentencing range of 37 to 46 months on Counts 1 and 2.

Mendez lodged no objection to the PSR. The government, however, took exception. The government filed a sentencing memorandum, which Mendez also did not object to, in which it argued that Count 2 (conspiracy to encourage aliens to reside in the United States) provided the higher offense level. We start with the government's math and move on to its rationale.

The government began with a base offense level of 12, as provided by USSG § 2L1.1(a)(3). Like the guideline pertinent to Count 1 (§ 2L2.1), this provision called for the offense level to be increased by various levels in certain circumstances. However, the determining factor was not the number of documents involved but rather the number of aliens induced or harbored. Id. §

- 5 -

2L1.1(b)(2). Suggesting that there were sufficient facts to demonstrate that Mendez had induced or harbored 100 or more aliens, the government applied a 9-level enhancement. Id. § 2L1.1(b)(2)(C). Like the PSR, the government added a 3-level enhancement for Mendez's supervisory role and a 2-level reduction for acceptance of responsibility. This placed the offense level for Count 2 at 22 (one level higher than Count 1), which would mean Mendez faced a guideline sentencing range of 41 to 51 months on Counts 1 and 2. Given the mandatory sentence of 24 months on the remaining counts, the ultimate range was 65 to 75 months with the government recommending the low end.

For our purposes, the important part of the government's calculus is the 9-level enhancement it proposed. Basically (and we will say more on the particular theories in a bit) the government thought that Mendez had not only trafficked 100 documents, but had also induced or harbored 100 aliens, therefore justifying the enhancement on Count 2. According to the sentencing memorandum, this is why. The government, which suggested that the whole conspiracy involved over 1,500 trafficked identities, noted that some of Mendez's co-defendants had admitted in their plea agreements that they had worked with Mendez, the conspiracy involved over 100 documents, and the documents were being trafficked to undocumented aliens. One particular co-defendant, "Pena," admitted that he was involved in trafficking at least 70

documents, which had been sent to him by Mendez, to undocumented aliens in Massachusetts. The government also pointed out that on the day of Mendez's arrest, another 20 identities were found in his home presumably slated for more undocumented aliens. Furthermore, text messages intercepted from Mendez's phone during a 4-month period contained approximately 60 identities that he was trafficking. The government concluded that "[e]xtrapolating over the two-year conspiracy, this shows that well over 100 identities were involved in this case."

The government thought the PSR further supported its position. It reasoned that because the PSR had found that 100 or more documents had been involved, warranting the 9-level enhancement for Count 1 under § 2L2.1, it necessarily followed that over 100 document sets pertaining to over 100 aliens were involved. It based this claim on Note 2 of § 2L2.1, which (at least according to the government) "reads that 'one document' is a 'set of documents intended for use by a single person.'"[3]

---

[3] The government selectively quotes and then contorts the note's language. In its entirety, it provides: "Where it is established that multiple documents are part of a set of documents intended for use by a single person, treat the set as one document." USSG § 2L2.1, note 2. The actual language makes the government's theory suspect. There is no indication that probation found such a thing established and, therefore, was using the term "document" in the manner suggested by the note. Probation simply could have meant 100 single documents, indeed the PSR (and indictment) defined "unlawful documents" and "unlawful document sets" differently.

The probation office responded to the government in an addendum to the PSR. It stood by its position that Count 1 provided the higher offense level, indicating that the office was "not convinced that [Mendez] indeed harbored or induced over 100 aliens."

**D. Sentencing**

At the sentencing hearing, the government emphasized its contention that the 100-alien enhancement should apply, making Count 2 yield the higher offense level. For support, it simply reiterated the argument about Note 2's language, again extrapolating that a finding of 100 documents is equivalent to 100 aliens being induced or harbored. Mendez made no comment on the government's position. Nor did the judge weigh in on the disagreement between probation and the government.

After some back and forth on issues not relevant to this appeal, the judge handed down the sentence. Noting that Counts 1 and 2 had been grouped, the judge found that the pertinent guideline was § 2L2.1. Recall, this is the provision applicable to Count 1, the count that probation thought controlled and which yielded the lower offense level. The judge then went on to calculate the offense level in the same manner as the PSR. He stated that there was a base offense level of 11 and that "since the offense involved 100 or more documents," a 9-level enhancement was warranted. The judge then applied the supervisory enhancement

and the acceptance of responsibility reduction. This should have taken the grand total to 21, as it did for probation; however, the judge completed his guidelines calculation by stating that the end result was "a total offense level of 22." This, the judge indicated, yielded an imprisonment range of 41 to 51 months.

The judge continued, stating that the "presentence investigation report had adequately applied the guideline computations" and that those computations "satisfactorily reflect the components of this offense by considering its nature and circumstances." He then briefly contemplated the 18 U.S.C. § 3553 factors, noting the mitigating factors (e.g., no history of drugs or prior convictions) and the serious nature of the offense. The sentence was then handed down with Mendez getting a top-of-the-range sentence of 51 months on Counts 1 and 2, and the mandatory agreed upon consecutive sentence of 24 months on the remaining counts, for a total of 75 months.

Understandably confused by the fact that the judge calculated Mendez's offense level utilizing the PSR's calculations, but then came out with the offense level of 22 as advocated for by the government, the prosecutor asked for clarification. Counsel pointed out the discrepancy and then asked: "So, I just want to confirm that Your Honor, when coming to the twenty-two . . . did find that as to Count 2 the enhancement for over a hundred aliens should apply; and that for Count 1 and Count

2, Count 2 should control." The judge responded: "It does control. Count 2 controls. We have two out, plus 9 is 21; plus 3, 24; minus 2, since there was no third point is the 22 that I mentioned." Mendez's attorney did not object to this computation but did ask the court to reconsider its sentence, pointing out that Mendez was a first-time offender, he would face deportation, and some of his supposedly more culpable co-defendants had received lesser sentences, albeit from different judges. The judge declined. This appeal followed.

## ANALYSIS

Sentences must be both procedurally and substantively reasonable. United States v. Clogston, 662 F.3d 588, 590 (1st Cir. 2011). Mendez says his was neither.

On the procedural front, he first argues that the court erred in applying the 9-level enhancement for the number of aliens induced or harbored. More to the point, he claims that (1) the court failed to make an individualized finding as to the number of aliens attributable to Mendez, (2) even if the court had, the record did not support a finding of 100 aliens, and (3) the upward adjustment resulted in double-counting.[4] Mendez's second

---

[4] Mendez also raises what he concedes is a legally unmeritorious argument simply for preservation purposes. Citing Alleyne v. United States, 133 S. Ct. 2151 (2013), Mendez argues that an upward adjustment based on judicial fact finding should be deemed unconstitutional.

procedural-based offering is that the judge failed to adequately explain why Mendez deserved a top-of-the-range sentence and instead impermissibly presumed it was reasonable because it fell within the guidelines range.

With respect to substantive reasonableness, Mendez claims that his 75-month aggregate sentence was too long. Among other things, he points to the comparatively shorter sentences some of his cohorts got, his first-time offender status, and the fact that the sentence exceeded the government's recommendation.

We start, and ultimately stop, with Mendez's claim that the judge erred in applying a 9-level enhancement for having induced or harbored 100 aliens. We review this claim for plain error as Mendez failed to preserve it below. United States v. Ramos, 763 F.3d 45, 56 (1st Cir. 2014). That is, we ask whether "(1) an error occurred; (2) the error was clear and obvious; (3) the error affected the defendant's substantial rights; and (4) the error impaired the fairness, integrity, or public reputation of the judicial proceedings."[5] Id. at 56 n.15.

Unfortunately, it is impossible to determine, based on this record, whether a clear and obvious error (or for that matter,

---

[5] What the third prong of this test means in the sentencing context is that, but for the error, it is reasonably probable that the judge would have imposed a more favorable sentence. United States v. Ahrendt, 560 F.3d 69, 77 n.5 (1st Cir. 2009). And to satisfy the fourth prong, "a defendant must then show that leaving the error uncorrected would cause a miscarriage of justice." Id.

- 11 -

any error at all) occurred.  "While we have on occasion gone to significant lengths in inferring the reasoning behind, and thus in affirming, some less-than-explicit explanations by district courts, there are limits." United States v. Gilman, 478 F.3d 440, 446 (1st Cir. 2007) (citations omitted).  If we are in fact wholly unable to discern the court's rationale, appellate review is unworkable and a remand is necessary. Id. at 446-47.  That is the case here.

The judge did not make any finding with respect to whether Mendez had indeed induced or harbored 100 aliens.  In fact, the judge said not a word about how he determined this particular enhancement was warranted.  He simply stated that "Count 2 controls."  Notably, this little tidbit came out not during the handing down of Mendez's sentence, but only when the understandably confused prosecutor asked for clarification.

We simply have no idea why the judge applied an alien-based enhancement, rather than a document-based enhancement as suggested in the PSR, or why an enhancement should apply at all.  Perhaps the judge found the evidentiary proffer suggested by the government at the change-of-plea colloquy sufficient to bring the attributable number of aliens induced or harbored up to 100.  Or maybe he latched on to the government's questionable theory, advanced both in its sentencing memorandum and at the sentencing hearing, that one can extrapolate from Note 2 of § 2L2.1 that

probation's finding of 100 documents is tantamount to a finding of 100 aliens. There is also the prospect that the judge was, as Mendez suggests, attributing the conspiracy-wide harm to Mendez.[6]

On top of this, we have the confusion caused by the judge utilizing probation's offense-level calculation (minus the correct sum total), stating that "the offense involved 100 or more documents," and indicating that the PSR got it right. (Emphasis added.) There is also the fact that the record does not make it irrefutably clear that Mendez did in fact induce or harbor 100 aliens. Notably, probation and the government, though faced with the same record, disagreed on this point. Indeed to reach the 100-aliens mark, in the government's own words, some "extrapolating" is required.[7]

All that being the case, we would be hard pressed to apply the oft-invoked maxims that the government emphasizes here.

---

[6] To support this notion, Mendez points to the government's sentencing memorandum, which sometimes conflated Mendez's individual culpability with that of the overall conspiracy. For example, it stated a couple of times that enhancements on Counts 1 and 2 were warranted because "the conspiracy involved over 100 documents and aliens." (Emphasis added.)

[7] The extrapolating the government focuses on is extending the proffered amount of documents and identities out over the lifetime of the conspiracy. But it seems to us there is another issue. The record reveals that individual aliens sometimes received more than one document for the same identity, and even those documents sometimes had to be replaced with additional documents. Without specific findings by the sentencing judge, this makes it impossible for us to conclude on the record that one document, or one document set, equals one alien harbored or induced.

Yes, it is true that a "court's reasoning can often be inferred by comparing what was argued by the parties or contained in the pre-sentence report with what the judge did." United States v. Rodríguez, 731 F.3d 20, 28 (1st Cir. 2013). And indeed, the law "does not require a district court to be precise to the point of pedantry." United States v. Fernández-Cabrera, 625 F.3d 48, 53 (1st Cir. 2010). But this only takes us so far and invoking these axioms here would effectively render our review meaningless. "[I]n the end we must be able to figure out what [the court] found and the basis for the findings to the extent necessary to permit effective appellate review." United States v. Zehrung, 714 F.3d 628, 632 (1st Cir. 2013) (citation omitted). We cannot do that here and, therefore, are unable to effectively consider even the first prong of plain error review.

## CONCLUSION

Let us be perfectly clear. We recognize that "the plain error hurdle is high," United States v. Hunnewell, 891 F.2d 955, 956 (1st Cir. 1989), and the administration of justice has been well-served over the years by our strict enforcement of this standard. Here, however, the inscrutable footing on which the district court's sizeable enhancement stands thwarts our ability even to conduct plain error review. We caution then that this decision should not be read as a relaxation of the plain error standard but, rather, as a reminder to sentencing courts that,

where the basis for an enhancement is neither obvious nor inferable, some explanation should normally be forthcoming.

For the reasons laid out above, we vacate the sentence and remand to the district court for resentencing consistent with this opinion. We do not take a stance on what the sentence should be, or whether a document-based or alien-based enhancement (or neither) is warranted. That is, within wide limits, up to the sentencing judge. We leave untouched Mendez's claims that his sentence was substantively unreasonable, and that the judge failed to adequately explain his top-of-the-range sentence, as these claims are inevitably tied to the enhancement the judge tacked on and, therefore, subject to change on resentencing.